# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 19-cr-1036-CJW |
|---|---|
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, REQUEST FOR EVIDENTIARY HEARING, AND MOTION FOR *FRANKS* HEARING** |
| CAMERON HATCHER, | |
| Defendant. | |

---

## TABLE OF CONTENTS

I.     *INTRODUCTION*..................................................................................2

II.    *FINDINGS OF FACT*..........................................................................2

III.   *DISCUSSION*...................................................................................10

     A.     *The Parties' Positions*.................................................10

     B.     *Defendant's Fourth Amendment Rights*......................11

     C.     *Whether Ms. Barner Consented to the Officers' Entry*...................13

     D.     *Whether Entry was Justified by Probable Cause and Exigency*.........17

         1.     *Whether the Search was Supported by Probable Cause*...........18

         2.     *Whether There was Probable Cause to Believe Evidence Would be Destroyed*....................................................26

     E.     *Whether the Officers were Justified in Making a Protective Sweep* .... 29

*F.*      *Whether Ms. Barner's Consent to Seize the Gun Purged any Taint....* 32

*G.*      *Whether the Officers Relied in Good Faith on the Warrant* ............. 38

*H.*      *Whether Defendant is Entitled to a* **Franks** *Hearing* ..................... 41

*IV.*    *CONCLUSION* ................................................................................43

## I. INTRODUCTION

Before me is Defendant's Motion to Suppress Evidence, Request for Evidentiary Hearing, and Motion for *Franks* Hearing. (Doc. 19.) The Government filed a timely resistance to the motion. (Doc. 24.) I held a hearing on January 8, 2020 to hear the parties' positions on, among other things, Defendant's request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). The Government called two witnesses, Officer Brandon Gudenkauf and Officer Nicholas Schlosser of the Dubuque Police Department. Among the exhibits admitted into evidence are their reports and other officers' reports. Other exhibits include audio and video recorded from Officer Gudenkauf's body camera and Officer Justin Dura's body camera. The Defendant called no witnesses. Defendant filed a timely post-hearing brief. (Doc. 29.) The matter is now fully submitted.

On September 24, 2019, the grand jury returned an indictment charging Defendant with one count of Possession of a Firearm by a Felon and Drug User in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), and 924(a)(2). (Doc. 2.)

## II. FINDINGS OF FACT

At about 10:30 p.m. on June 16, 2019, the Dubuque Police Department received reports of a shooting[1] at a gathering in the 2400 block of White Street in Dubuque. (Def.

---

[1] Defendant was ultimately ruled out as the shooter and another suspect was charged in state court. (Schlosser Jan. 8, 2020 Hr'g Test. at 59-60.)

Ex. G (Appl. for Search Warr.).)  As police arrived, people were dispersing by foot and in vehicles, including a small dark SUV.  An unidentified witness followed the vehicle from the scene while speaking to the police dispatcher.  This reporting witness gave the SUV's license plate to the police dispatcher and the vehicle was determined to be registered to Misty Marie Barner of 1331 Pine Street.

Officer Justin Dura was responding to the shooting when he learned about the small dark SUV fleeing at a high rate of speed.  (Def. Ex. B (Dura Report).)  Officer Dura was told the vehicle was parked in the 1300 block of Elm Street.  People in the area redirected him to the 1300 block of Pine Street where he located the SUV and determined no one was inside.  (*Id.*)  Officer Dura did not see anyone leaving the vehicle.

Officer Gudenkauf found the SUV parked on Pine Street at about the same time as Officer Dura.  (Def. Ex. D (Gudenkauf Report).)  They learned that a witness had reported that someone had parked the SUV and fled from it.  Over his radio, Officer Gudenkauf learned that someone had fled from the black SUV.  (Gudenkauf Jan. 8, 2020 Hr'g Test. at 26.)

Defendant, who was ultimately determined to be a resident of 1331 Pine Street, came out of the house and approached Officer Dura.  (*Id.* at 18, 29.)  Defendant was "very nervous, speaking very fast, and was very sweaty."  (*Id.* at 18.)  Defendant's behavior and appearance raised "red flags" for Officer Gudenkauf that he might be somehow involved in the shooting.  (*Id.*)  Defendant told officer Dura he had just arrived in the SUV after hearing shots fired in the 2400 block of White Street.  Defendant told Officer Dura that his girlfriend, Misty Barner, had been driving.  Officer Gudenkauf testified he overheard Defendant telling Officer Dura that Ms. Barner had driven from the scene of the shooting.  (*Id.* at 45-46.)  Defendant's statement to Officer Dura on this issue can be heard on the Officer Gudenkauf body camera audio.  (Def. Ex. E at 22:25:17.)

3

Meanwhile Officer Gudenkauf and Officer Wood spoke with Ms. Barner in the residence and learned that she had not been with Defendant at the gathering. (*Id.* at 46.) When confronted with this discrepancy, Defendant admitted he had driven himself and claimed to have lied because he did not have a valid driver's license.

The interaction between Officer Gudenkauf[2] and Ms. Barner is central to this dispute. While Officer Dura spoke with Defendant, Officers Gudenkauf and Wood went to speak with Ms. Barner in the residence. (*Id.* at 19.) When Ms. Barner opened the door, Officer Gudenkauf testified that he "asked Ms. Barner to step inside the house," with the intention of visiting with her outside of Defendant's presence. (*Id.*) He testified that Ms. Barner let the officers in without protest, hesitation, or reluctance. (*Id.* at 19-20.)

I find Defendant's characterization of Officer Gudenkauf's video[3] of this entry to be reasonably accurate:

> Wood[4] then stated, after scarcely a minute had gone by: "Let's step inside and talk for a second." Barner stepped backwards as officers stepped toward her, not turning her back but retreating a few feet into her living room, while officers stepped in front of her and stood close to her, a few feet inside her doorway, in her living room.

(Doc. 29 at 6 (citing Def. Ex. E at 22:27:40-22:27:47.)[5].) I find the entrance occurs at 22:27:39 as shown in Officer Gudenkauf's video. (Def. Ex. E.) Officer Gudenkauf's

---

[2] Officer Gudenkauf was acting as a field training officer for Officer Wood who was with Officer Gudenkauf for most of this interaction. Officer Wood did not testify.

[3] All references to "videos" are to the officers' individual body camera videos.

[4] I find it was actually Officer Gudenkauf who stated, "Let's step inside and talk for a second." From repeated viewing, I believe the voice matches Officer Gudenkauf's at other points where it is clearly him speaking. In addition, Officer Gudenkauf slightly interrupts Officer Wood's questioning to make this statement.

[5] Both parties have offered Exhibits containing body camera video. The videos appear to depict the same events; however, the versions offered by Defendant have additional time markings that are not shown on the Government's versions of those videos I

description of the moment of entry and the Government's description of the entry do not match the video evidence. Officer Gudenkauf testified:

> Q. Did she, in fact, just step in and kind of hold the door or at least gesture for you to come in as well?
> A. Correct.

(Gudenkauf Hr'g Test. at 20.) The Government stated, "Gudenkauf requested that Barner, Wood, and he step inside to talk. Barner did not object or voice any concern over this request. Instead, as shown on Gudenkauf's body camera footage, she immediately turned and went into the house, followed by the two officers." (Doc. 24 at 9.) The video shows no protest by Ms. Barner. Whether she "seemed reluctant" is, of course, somewhat subjective. Moreover, she was not given an opportunity to express reluctance, objection, or concern as the two officers entered. She had earlier expressed her confusion about what was happening. Having reviewed the video of the moment of entry many times, I find that she did not turn and walk into the residence. Rather, she stepped backward as the officers advanced, although she may have turned slightly during this process. She made no gestures, although as the officers are entering, she did touch her face or glasses. She clearly did not hold the door for the officers. There was no screen door present. The door hung open as she talked to the officers. At different times in the video, as people open and close it, it is apparent that the door need not be held open.

Officer Gudenkauf told Ms. Barner he was investigating a shooting. (Gudenkauf Hr'g Test. 33.) Officer Gudenkauf soon learned Ms. Barner and Defendant were boyfriend and girlfriend. (*Id.* at 20.) Ms. Barner reported that she had been home all

reviewed. I have principally relied on the Defendant's exhibits with the time markings that appear to correspond with actual time (i.e. beginning at about 22:21 (10:21 p.m.) on June 16, 2019). (Def. Ex. C.)

night and was in her bedroom with her son when Defendant entered the residence and left again shortly thereafter. (*Id.*) While Defendant had briefly been in the house, he went up to Ms. Barner's bedroom, opened her bedroom door, and shut it. She did not know where else in the house he might have gone. This seems to have raised a concern with the officers that Defendant might have thrown a gun in the bedroom. (*Id.* at 34.) Ms. Barner gave the officers permission to quickly look in the bedroom. (*Id.* at 21.) Ms. Barner told officers there were two other people in the residence, her juvenile son and her uncle. (*Id.* at 35.) The officers made a quick inspection of the bedroom and then returned to the living room. (*Id.* at 21.) Officer Gudenkauf asked Ms. Barner if he could walk around the rest of the house, but she declined to give him permission. (*Id.*) Officer Gudenkauf testified he wanted to make a protective sweep because of the nature of the crime they were investigating (i.e., a shooting) and the concern that someone could have returned to the residence from the shooting with Defendant. (*Id.*)

At 22:50:30 of Officer Gudenkauf's video, Ms. Barner had been sitting alone on the sofa when she stood up and began moving around the living room. (Def. Ex. E.) She was instructed not to move around because of the officers' concern regarding a suspected gun. Ms. Barner stated, "Can you go outside? (*Id.* at 22:50:47.) She also stated, "I let you come inside my house to look at stuff and now you tell me I can't move around my house." (*Id.*)

Officer Gudenkauf testified he did not immediately perform a protective sweep because he was not certain the vehicle had been involved in the shooting. (Gudenkauf Hr'g Test. at 22.) Instead, he went outside to speak with Officer Dura while Officer Woods remained inside with Ms. Barner. (*Id.*) Officer Dura had just confirmed with their supervisor that Ms. Barner's SUV was involved in the shooting. (*Id.* at 23.) The officers on the scene concluded they would, therefore, be required to remain for "an extended period of time" that might include the time necessary to apply for a search

warrant. (*Id.*) Ultimately, Officer Gudenkauf performed what he considered a protective sweep. The known occupants of the house were gathered in the living room and then Officer Gudenkauf checked the other rooms in the house "to ensure there was no one else that could present a danger." (*Id.* at 23.) Other than the Ms. Barner, her son, and her uncle, the officers had no knowledge there was anyone else in the house. (*Id.* at 36.)

Officer Gudenkauf estimates about 20 minutes passed before he decided to gather the home's occupants in the living room. (*Id.* at 41.) Officer Gudenkauf's video is divided in two segments: Government Exhibits 1 and 3 and Defendant's Exhibits E and F. The first video covers the first part of his interaction at the scene. Officer Gudenkauf and Officer Wood enter the residence at 22:27:39. (Def. Ex. E.) At the end of the first video, Officer Gudenkauf had just left the residence, perhaps to consult with other officers. The second segment of Officer Gudenkauf's video begins when he reenters the residence. (Def. Ex. F.) At 23:03:25, he told Ms. Barner of his plan to secure the house by detaining everyone and gathering them in one room. (*Id.*) At this point, Ms. Barner clearly refused the officers her consent to the sweep. The actual process of gathering Ms. Barner's son and uncle gets underway rather slowly because Ms. Barner was reluctant and the officers were trying to induce her to cooperate. It appears Officer Gudenkauf consulted with someone during an unrecorded interval between the two video segments. Nevertheless, based on the video time stamps, I find that approximately 36 minutes elapsed from the time officers first entered the residence until they announced their intention to secure the residence and make a protective sweep.

Officer Gudenkauf explained that he did not immediately secure the house because he did not know if the SUV was involved in the shooting. (Gudenkauf Hr'g Test. at 42.) During this 36-minute interval, Officer Gudenkauf believed he did not have enough information to conduct a protective sweep. (*Id.*) It was not until he learned from his supervisor through Officer Dura that the vehicle had been involved in the shooting that

he concluded officers would be on the scene for a long period of time and potentially subject to assault by people hiding in the residence. (*Id.* at 43.)

At the end of the sweep, the only remaining door left unchecked was a closed door that led from the living room to the top of the basement steps. (*Id.* at 23.) When Officer Gudenkauf attempted to open it, it proved to be blocked. Looking through the partially opened door, he observed a television blocking it and a black semi-automatic handgun sitting on the top step which he announced was in plain view. (*Id.* at 23-24; Def. Ex. F at 23:10:30.) Officer Gudenkauf saw dust covering everything (except the gun) and cobwebs stretched across the steps, which indicated to him nobody had been downstairs recently. (*Id.* at 24.) Officer Gudenkauf did not attempt to force the door open and inspect the basement because the cobwebs and dust indicated no one had gone down the stairs. (*Id.* at 25.) Rather, one of the officers stood near the door until the gun was later seized. Although Officer Gudenkauf could have reached the gun, he did not do so because, at that point, he knew law enforcement would be applying for a search warrant. (*Id.* at 38.) From where Officer Gudenkauf stood outside the door he was unable to see whether anyone was in the basement and he did not know if there was an exterior entrance to the basement. (*Id.* at 40.)

Officer Nicholas Schlosser is assigned to the Criminal Investigations Division of the Dubuque Police Department and is an ATF task force officer. (Schlosser Jan. 8, 2020 Hr'g Test. at 48.) He testified that he is experienced in firearms investigations. He was off duty at the time of the shooting but was called in shortly thereafter. (*Id.* at 48-49.) He traveled to 1331 Pine Street after learning the gun had been found. (*Id.* at 51.) When Officer Schlosser arrived, he told Ms. Barner that he was potentially investigating a homicide. (*Id.* at 55-56). He testified that he asked Ms. Barner for permission to take the gun and she granted such permission. (*Id.* at 56.) Rather than immediately seize the

8

gun, Officer Schlosser conferred with his captain who decided to seek a search warrant before seizing it. (*Id.* at 57.)

The application sought authority to search the SUV and the residence for evidence associated with the shooting, including, in pertinent part, the handgun and magazine seen by the police in the residence. (Gov. Ex. 8.) The affidavit was sworn to by Corporal Kurt Horch who did not testify at the hearing. His affidavit briefly describes the shooting, the fleeing SUV, and the investigation at 1331 Pine Street, including Officer Gudenkauf's observation of the gun.

Defendant identifies three errors or omissions in the affidavit: (1) the affidavit states that Officer Dura saw the driver exit the SUV and run toward the railroad tracks when, in fact, this behavior had been reported by other witnesses; (2) the affidavit omitted Defendant's explanation for why he had lied about driving (i.e., that he did not have a valid driver's license); and (3) the affidavit identifies one of the occupants of the residence as Ms. Barner's father rather than as her uncle. I find Defendant has correctly identified each of these items as an error or omission. Officer Dura did not, according to his report, see the driver flee the vehicle. (Gov. Ex. 5.) His report says that he was advised of this fact and his video shows he encountered Defendant later. The affidavit does not include Defendant's explanation for his lie. Ms. Barner's uncle, not her father, was present in the residence. The significance of these errors and the omission will be discussed, as necessary, below.

I note an additional possible discrepancy in the affidavit, which was subject to some testimony but never adequately explained. The affidavit states, "The magazine appeared to have been jarred loose, as if the gun was tossed there, and not placed." (Gov. Ex. 8 at 3.) Neither Officer Schlosser nor Officer Gudenkauf testified that the magazine was dislodged.

9

After obtaining the search warrant shown in Government's Exhibit 8, Officer Schlosser returned to the residence at 1331 Pine Street, served the warrant and seized the gun along with a purple shirt Defendant had been wearing. (*Id.* at 57-58.)

Officer Schlosser also testified that City of Dubuque traffic cameras showed Defendant in the SUV pull up to a corner where the shooting happened, and then immediately flee at a high rate of speed. (*Id.* at 58-59.) This made Officer Schlosser suspect a possible drive-by shooting. (*Id.*) Defendant was transported to the Dubuque Law Enforcement Center where he gave a voluntary interview. When confronted about the gun found on the stairs, Defendant stated he kept the gun at the top of the stairs for protection. (Gov. Ex. 7 at 4.)

## III.  DISCUSSION

### A.  The Parties' Positions

Defendant argues that law enforcement made an unconstitutional and unwarranted search of the residence, which resulted in discovery of the gun on the stairs. He contends Ms. Barner did not consent to law enforcement's entry and no exigency justified the entry. He further contends that the protective sweep and exigency exceptions to the warrant requirement do not apply. He argues Ms. Barner's consent to allow Officer Schlosser to remove the gun does not vitiate law enforcement's prior unconstitutional conduct. Further, he argues Officer Gudenkauf's observation of the gun during the unconstitutional search must be excised from the warrant application. Without that observation, Defendant contends the warrant fails for lack of probable cause. He also contends the *United States v. Leon* good faith exception does not apply because the officers' prewarrant conduct was clearly illegal.

Defendant makes a contingent *Franks* argument. He concedes that if Officer Gudenkauf's observation of the gun is not suppressed, then the affidavit establishes probable cause regardless of the affidavit's errors or omissions. In other words, if law

enforcement's actions that led to Officer Gudenkauf's observation of the gun were lawful, then there is probable cause for the warrant. (Hearing Tr. at 5-6.)

The Government contends the officers' initial entry into the residence was justified by Ms. Barner's consent and by exigent circumstances. The Government further asserts the officers were justified in making a protective sweep during which Officer Gudenkauf observed the gun in plain view. The Government contends officers relied in good faith on the search warrant, making suppression unnecessary under *Leon*.

Finally, the Government argues that Defendant is not entitled to a *Franks* hearing. However, the Government made a concession at the hearing that may render the issue moot, as discussed below. The Government's concession mirrors Defendant's. The Government concedes that if the Court suppresses Officer Gudenkauf's observation of the gun, then the warrant lacks probable cause. (Hr'g Tr. at 5-6.) Because the parties agree that law enforcement's knowledge of the gun is the key to the determination of probable cause, I will commence my analysis by determining if they obtained that knowledge lawfully.

## B.    *Defendant's Fourth Amendment Rights*

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation omitted). "[A]n entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and sanctity of the home, and justify the same level of constitutional protection." *Mahlberg v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992)

11

(quoting *Payton*, 445 U.S. at 588).  Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  This protection begins at the entrance to the dwelling.  *United States v. Vance*, 53 F.3d 220, 221-22 (8th Cir. 1995) (quoting *Payton*, 445 U.S. at 590) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.").  Although warrantless searches and seizures inside a home are presumptively unreasonable, there are exceptions to the warrant requirement "because the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City*, 547 U.S. at 403 (quotations omitted).

The simple, baseline definition of a "search" under the Fourth Amendment is when "the Government obtains information by physically intruding on persons, houses, papers, or effects." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quotation omitted).  A search also occurs when there is official intrusion into something "an individual 'seeks to preserve . . . as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Carpenter v. United States*, ---U.S.---, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  When physical intrusion on a constitutionally protected area is present in a case, it is unnecessary for the Court to "inquire about the target's expectation of privacy." *Grady v. North Carolina*, 575 U.S. 306, 308-09 (2015) (per curiam).

An individual invoking Fourth Amendment protection must have a justifiable, reasonable, or legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quotations omitted). To attain this expectation of privacy, the expectation must be subjectively held and objectively reasonable, meaning it is one that society is prepared to recognize. *Id.*  There is no doubt that Defendant has a recognized expectation of privacy in his home and that the entry into his home constitutes a search.

12

*C.*     *Whether Ms. Barner Consented to the Officers' Entry*

The Government first argues that the officers' entrance into the residence was justified by Ms. Barner's consent.  A warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of "unreasonable searches and seizures" if the officers obtained the consent of a third party who possessed common authority over the premises.  *United States v. Matlock*, 415 U.S. 164, 171 (1974).  Here, the police reasonably believed Ms. Barner possessed common authority over the premises, and in fact she did have such authority.  "The precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."  *United States v. Hardison*, 859 F.3d 585, 590 (8th Cir. 2017) (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001)) (alterations in original).  Defendant does not contest Ms. Barner's common authority over the residence.  Thus, the first issue is whether Ms. Barner in fact consented to the entry by police.

The Defendant relies upon the following authorities regarding the process for determining if a consent was valid:

> Whether consent is voluntary is a factual question depending on whether, on the basis of all the facts, the person giving consent did so "without coercion, express or implied."  *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005).  The government bears the burden of showing the voluntariness of consent.  *Id.*  Whether a person expressed consent at all is also a question of fact.  *United States v. Spotted Elk*, 548 F.3d 641, 650 (8th Cir.2008).  Consent "may be in the form of words, gesture, or conduct."  *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976)).  However, the government's burden to show voluntary consent "is heavier where consent is not explicit, since consent 'is not lightly to be inferred.'"  *United States v. Impink,* 728 F.2d 1228, 1232 (9th Cir.1984) (quoting *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir.1979)).

(Doc. 29 at 5.) Defendant also relies, in large part, on *United States v. Rodriguez*, which bears similarity to the case before the Court. No. 8:15CR103, 2015 WL 4546751, at *2 (D. Neb. July 28, 2015), *rev'd and remanded*, 834 F.3d 937 (8th Cir. 2016). At various points of his argument, Defendant relies on the Magistrate Judge's Report and Recommendation, the District Court's ruling, and the Eighth Circuit's opinion.

In *Rodriguez (D)*[6], law enforcement was investigating suspected marijuana production at the defendant's residence. *Id.* at *1. As part of the investigation, the investigating officer went to the defendant's residence to conduct a "knock and talk" with the defendant. *Id.* at *2. The investigating officer testified that "the defendant answered the door, stepped outside, and pulled the door shut behind him." *Id.* When the defendant pulled the door shut, the officer smelled marijuana. *Id.* The officer identified himself as a law enforcement officer who was there to ask him some questions. *Id.* The officer testified he asked the defendant "if we could step in the residence to talk." *Id.* The defendant said "that he wanted to find more—ask more information or receive more information before he agreed to speak with [the officer.]" *Id.* The defendant turned, opened the door, and "stepped into the residence and [two officers] stepped in behind him." *Id.* In holding that the defendant's consent was not valid, the District Court opinion in *Rodriguez (D)* helpfully gathered and discussed many decisions that have touched on issues presented in the instant case, particularly the issue of implied consent. *Id.* at *9. For example, the District Court noted, "In the non-verbal context, a finding of implied consent generally requires overt body language, some affirmative act by defendant to indicate consent, or passive assent following being informed of the right to refuse consent." *Id.* (citing *United States v. Smith*, 973 F.2d 1374, 1376 (8th Cir. 1992) (stepping aside and motioning officers to enter held to be implied consent)). *Rodriquez*

---

[6] I refer to the District Court's opinion as *Rodriguez (D)* and the Eighth Circuit opinion as *Rodriguez (C)*.

(D) also noted, "consent cannot generally be inferred by a mere failure to object to the entry or search." *Id.* at *10 (citing *United States v. Shaibu*, 920 F.2d 1423, 1425–27 (9th Cir. 1990) ("'merely retreating into one's home while being followed by a police officer,' standing alone, does not constitute consent to a police entry and consent was not implied merely because defendant failed to object to officers entering an open door")).

In *Rodriguez (C)*, the Eighth Circuit reversed the District Court, holding that the officers' belief that the defendant had consented to their entry was objectively reasonable. *United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016). *Rodriguez (C)* reasoned that when the defendant did not close the door behind him when he entered his home or protest when officers entered, "opened the door wider with one hand, and walked inside with his back to the officers," objectively reasonable officers could interpret the defendant's actions as an invitation to enter, although the conduct was "close to the line of validity." *Id.*

Here, the Government bears a heavier burden of showing the consent was voluntary because it was not explicit and "consent is not lightly to be inferred." *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (quoting *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979)). Considering all of the facts at the time of the entry, I recommend the Court conclude consent was lacking. The officers knocked at minute 22:26:07 of Officer Gudenkauf's first video. (Def. Ex. E.) Ms. Barner opened the door at 22:26:30. (*Id.*) She was talking on the phone at the time. At 22:26:33, she stated, "I'm really confused about what's going on." (*Id.*) Officer Wood had begun taking her name and gathering information about her whereabouts during the evening. (*Id.*) Officer Gudenkauf asked, "Do you mind to hanging up the phone and talking with us for a minute?" and she hung up the phone. (*Id.* at 22:26:50.) Ms. Barner then asked, "What's going on?" (*Id.* at 22:27:13) She was then asked to identify Defendant and the people inside the residence. (*Id.* at 22:23:17.) During this interaction, squad car

emergency lights and police flashlights illuminated the scene. Both officers were uniformed and equipped with guns and batons. (Gudenkauf Hr'g Test. at 32-33.)

At 22:27:39—that is, a little more than a minute after knocking—Officer Gudenkauf stated, "Let's step inside and talk for a second." This statement, by itself, is ambiguous. It was not posed as a question and no reply was elicited. Defendant describes the statement, "Let's step inside," as cohortative (i.e., intended to encourage some joint action). Even if it was intended as a command, the verb "let" can mean "to give permission."[7] Whether this was a command or a request for permission to enter is dependent upon the context of the situation.

I do not find that Ms. Barner was coerced by the officers. They were as polite and as accommodating as they could be under the circumstances throughout their encounter with Ms. Barner. However, the absence of coercion is not the touchstone.

> Even if there was not implicit coercion in fact here, the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. "This will not do." *Johnson v. United States*, 333 U.S. at 17, 68 S. Ct. at 370. We must not shift the burden from the government—to show "unequivocal and specific" consent—to the defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.

*United States v. Shaibu*, 920 F.2d 1423, 1427–28 (9th Cir. 1990). I find it significant that Officer Gudenkauf begins moving forward into the house as he completes the sentence, "Let's step inside. . . ." Officer Wood, who is closer to Ms. Barner, also begins moving into the residence at Officer Gudenkauf's statement. They did not wait for any sign of consent. At this juncture, Ms. Barner would have had to make some

---

[7] Let means "to allow something to happen or someone to do something by giving permission or by not doing anything to stop it from happening." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/let.

affirmative action to stop the entry by telling them to stop, raising her hand, or otherwise. However, she is not required to make an objection to prevent the intrusion. Rather, the Government is required to prove the consent. This it has not done. The signs of affirmative consent that were present in *Rodriguez* are not present here. Ms. Barner did not open the door wider to allow the officers easy access and she did not turn her back on the officers to "lead the way" into her home. It appears that she did not have the opportunity to close the door because Officer Gudenkauf began moving into the house as he was speaking. I recommend the Court find the Government has not met its burden of establishing unequivocal and specific consent.

## D. *Whether Entry was Justified by Probable Cause and Exigency*

The Government also raises the exigency exception to justify the warrantless entry. This exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)) (alteration in original). The Eighth Circuit has held:

> Despite the protections of the Fourth Amendment, and the preference for search warrants, a search without a warrant is legal when "justified by both probable cause and exigent circumstances." *United States v. Walsh,* 299 F.3d 729, 733 (8th Cir.2002) (internal citation and quotation omitted). In certain narrow situations, therefore, exigency may be substituted for a warrant, but probable cause must be present before either a warrant or exigency will allow a search.

*Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003). "Exigent circumstances are present where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008) (citing *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). When a search or seizure is conducted without a warrant, the Government "has the burden of justifying the warrantless entry under one of the recognized exceptions." *United States v. Selberg*, 630

17

F.2d 1292, 1294 (8th Cir. 1980). The Government states its position on both the probable cause and the exigent circumstances as follows:

> In this case, officers were investigating a shooting that occurred minutes earlier at a nearby location. While subsequent investigation determined defendant was not involved in the shooting, officers at the time did not have that information. Instead, they reasonably relied upon information they had that defendant was seen speeding away from the scene of the shooting, fleeing to Pine Street and into the house, and then returned, sweating profusely. Once officers determined he entered the house for a brief time, they were justified in also entering the house to ensure anyone inside was safe and that there was no evidence being destroyed.

(Doc. 24 at 10.)

### 1. Whether the Search was Supported by Probable Cause

As confirmed in *Kleinholz*, officers may not effect a search of an individual's home without both probable cause and exigent circumstances. 339 F. 3d at 676. ("exigency may be substituted for a warrant, but probable cause must be present before either a warrant or exigency will allow a search.")

"The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). The court considers "the circumstances that confronted police at the time of entry" to evaluate whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Kleinholz*, 339 F. 3d at 676 (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules."

*Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

Officer Gudenkauf's video picks up part of the discussion between Officer Dura and Defendant soon after police arrive at the residence. For example, Defendant's statement that his girlfriend was driving is audible on Officer Gudenkauf's video. (Def. Ex. E at 22:25:16.) This is consistent with his testimony that he overheard this portion of the conversation. It is less clear that Officer Gudenkauf overheard Defendant tell Officer Dura that Defendant had gone inside. At 22:24:14 of Officer Dura's video, Defendant tells Officer Dura, "I just got in the house. She came to get me." (Def. Ex. C.) At that same point on Officer Gudenkauf's video, Officer Gudenkauf is walking toward the residence and the audio is muffled. Nevertheless, the collective knowledge doctrine may permit imputation of Officer's Dura's knowledge to Officer Gudenkauf:

> The collective knowledge doctrine "imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold 'an otherwise invalid search or seizure.'" *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (citing *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001)). This doctrine "requires some degree of communication between the officer who possesses the incriminating knowledge and the officer who does not." *Id.* This requirement is intended to distinguish between "officers functioning as a search team and officers acting as independent actors who merely happen to be investigating the same subject." *Id.* (citing *Gillette*, 245 F.3d at 1034). When officers function as a search team, probable cause to search is properly assessed on the basis of their combined knowledge because "we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person." *United States v. O'Connell*, 841 F.2d 1408, 1419 (8th Cir. 1988).

*United States v. Simmermaker*, No. 19-CR-55-CJW-MAR, 2019 WL 6045582, at \*8 (N.D. Iowa Nov. 15, 2019). In *Gillette*, the officer who searched a vehicle may not have had actual knowledge someone had consented to search the vehicle. 245 F.3d at 1033-34. The Eighth Circuit inferred from the record that the officer who performed the search "simply arrived on the scene and immediately began to search vehicles." *Id.* at 1034. However, because the officers acted as a team, the knowledge could be imputed to the officer even if he did not, in fact, know the relevant information. *Id.*

Here, the officers were acting as a team. Although they arrived separately, in the course of responding to the shooting, they immediately began coordinating their efforts. At 22:23:13 of Officer Dura's video as he approached the vehicle, he asked Officer Gudenkauf to check further down the alley. (Def. Ex. C.) Throughout the videos the communication and coordination among the officers is evident. Under *Gillette* this establishes "the requisite degree of communication" among the officers to make them a team and thus impute to Officer Gudenkauf the knowledge of Officer Dura that Defendant had gone inside the home. *See* 245 F.3d at 1034.

Thus, at the time Officer Gudenkauf said, "Let's step inside . . ." he possessed at least the following relevant information in determining probable cause:

1) A shooting had occurred minutes before at a nearby location;

2) Defendant left the scene at a high rate of speed and was followed to the address of the vehicle's registered owner, Misty Barner;

3) Defendant resided at the residence;

4) Defendant was sweating and nervous;

5) Defendant had gone inside briefly;

6) There was a discrepancy about who had been driving the vehicle. Defendant said Ms. Barner was driving, but she claimed to have been home all day;

7) Ms. Barner was Defendant's girlfriend;

8) Ms. Barner recognized Defendant using the same name he had given Officer Dura; and

9) Ms. Barner claimed she was in the house with her son and uncle.

Before examining the sufficiency of the probable cause, it is important to be clear: Probable cause for what? The Government argues the officers were justified in entering the house "to ensure anyone inside was safe and that there was no evidence being destroyed." (Doc. 24 at 10.) In *Minnesota v. Olson*, the Court upheld a lower court's conclusion "that in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors justifying the entry were present." 495 U.S. 91, 100 (1990). Thus, I am called upon to determine, given the totality of the circumstances, whether a reasonable person could believe there was a fair probability evidence was being destroyed.

It is less clear what the Government is asserting regarding the safety issue. The statement "to ensure anyone inside was safe" suggests the officers may have been engaged in their community caretaker function at the time of entry. However, neither party has addressed the different standard that applies to justify an entry as a community caretaker rather than as an investigator. "A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392–93 (1978); *United States v. Nord*, 586 F.2d 1288, 1291 n.5 (8th Cir.1978)).

> When acting to investigate and uncover crime, on the other hand, a police officer acts at the core of his or her duties; it is to these types of actions that the warrant clause of the fourth amendment is directed. *See Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948). A warrantless entry in such circumstances must be justified by probable cause to believe that a crime has been or is being committed and the existence of what are called exigent circumstances. Examples of such circumstances are

when an officer is in hot pursuit of a fleeing felon, and when an officer reasonably fears the imminent destruction of evidence or reasonably perceives a risk of danger to the police or others. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 109 L. Ed.2d 85 (1990).

*Id.* (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)). Fear of the destruction of evidence and risk of danger to the police or others are the only relevant listed examples of situations where probable cause is required when officers are acting in their investigative capacity. No one contends the police were in hot pursuit of a fleeing felon by the time Defendant was being interviewed by the SUV. To the extent necessary, I find the officers were not in hot pursuit of anyone at the time they first entered the residence.

Probable cause is a more exacting standard than reasonable belief. *Id. Quezada* noted that the lower standard

has led to some concern that a police officer might use his or her caretaking responsibilities as a pretext for entering a residence. The Ninth Circuit, therefore, has held that to justify an entry like the one in the present case an officer must have actually believed that an emergency existed and the belief must have primarily motivated his or her actions.

*Id.* Of course, the subjective intent of the officer is immaterial in assessing probable cause. *Id.* at 1008. (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). *Quezada* declined to decide the legal relevance of the officer's subjective belief because there was ample evidence he was investigating a possible emergency. *Id.* Here, I will assess the evidence under both the probable cause standard and the reasonable belief standard.

First, I will address whether there was probable cause to believe that someone in the residence was in danger. Law enforcement knew Defendant left the scene of the shooting at a high rate of speed. Officer Gudenkauf admitted that people flee the scene of a shooting for various reasons and there is "no way telling what the reasons are. I know one of the reasons though could be that they are involved, and the other one could

22

be that they're scared." (Gudenkauf Hr'g Test. at 27.) In other words, people might flee a shooting to escape detection by police or for their personal safety. The mere fact Defendant fled the scene helps establish it was *possible* for him to have been criminally involved, but it does little to show his awareness of guilt. The parties have not focused on the fact that he was followed from the crime scene by a white Escalade. (Def. Ex. E at 22:25:30.) His statement to Officer Dura about the Escalade supports his position that he fled in fear. For similar reasons, the evidence that Defendant was sweating profusely and was agitated adds little to make it more likely someone inside was in danger. Defendant's sweat and agitation could also be the result of innocently fleeing a shooting. I find the fact that Defendant fled the scene at a high rate of speed and appeared sweaty and agitated do little to establish probable cause to believe someone in the home was in danger. The fact that he went into his own residence where he was evidently recognized by his girlfriend, if anything, detracts from the estimation of danger to those inside. There were no facts to infer any kind of domestic disturbance at the residence.

One evident purpose of the investigation was to locate the gun that had been used in the shooting. Officer Dura asked Defendant if there were any weapons in the house, but he denied it. More to the point, once Officer Gudenkauf learned from Ms. Barner that Defendant was briefly inside and had opened and shut her bedroom door, he became concerned Defendant might have thrown a gun in the bedroom. At the point the officers entered the residence, they might have had a hunch Defendant went inside to secrete a weapon, but no more than a hunch. If they had probable cause at the moment of entry to believe a weapon was present, that might, in turn, raise some concern about the safety of the persons inside. However, that reasoning is simply piling surmise on conjecture. Moreover, it does not appear that officers knew about Defendant's drug use or criminal history that would make his possession of a firearm illegal. The mere hunch that a

possibly legal gun or even a gun that was evidence from the shooting would be present does little to establish probable cause to believe someone in the house was in danger.

The fact that Defendant was outside being detained by Officer Dura while the other officers entered deflates, to some extent, the concern someone inside might be in danger. There was no evidence to support an inference that someone inside the house had been injured during the brief time period Defendant was inside. For example, there were no screams, blood stains, gunshots, evident property damage, or ambulances to raise concern about the safety of people inside. The officers knew nothing about the history of Defendant or the other occupants, such as prior threats or violence, that would create any of the posed risk of safety.

The fact that Defendant went inside briefly may have given him an opportunity to secrete a gun or harm someone inside. This mere opportunity, however, does not support probable cause to believe either that he did secrete a gun or harm someone.

Finally, the officers knew that there was a discrepancy about who drove to the residence from the shooting. They later learned Defendant had lied, but at the time the officers entered the residence, Officer Gudenkauf knew only that there was a discrepancy. That is, Defendant said he and Ms. Barner left the shooting together while Ms. Barner claimed to have been home all day. This discrepancy does not lead to probable cause to believe someone in the residence was in danger. At most, it leads to some suspicion that Ms. Barner could have also been in the SUV at the shooting. There is nothing in the record, however, that shows the officers suspected her of the shooting. The officer did not articulate how she posed any danger to someone in the residence. For these reasons, I conclude that probable cause was not present to support a belief someone in the house was in danger.

As stated in *Quezada,* if the officers were acting in their rolls as community caretakers when they entered the residence, the applicable standard would be "reasonable

belief" that an emergency exists. In *Quezada*, the objective evidence of a possible emergency was sufficient and, therefore, the Court declined to address the legal relevance of the subjective intent of the officer. 448 F.3d at 1008. Here, I believe the Court should find the objective evidence sufficient to reach the opposite conclusion. In light of the evidence reviewed above, no reasonable officer could have concluded that an emergency was at hand.

If, however, the Court considers the subjective intent of Officer Gudenkauf, it is clear he entered the residence in his investigative capacity, that he did not subjectively believe there was an emergency that required attention, and, therefore, his belief in an emergency did not primarily motivate his actions. Officer Gudenkauf candidly stated his reasons for entering the residence:

> Q. And at some point on the video you asked Ms. Barner to step inside the house; is that correct?
> A. Yes.
> Q. Why did you do that?
> A. So I would get an honest statement out of her, so she's not speaking right in front of Mr. Hatcher.
> Q. So to get some separation?
> A. Yes.

(Gudenkauf Hr'g Test. at 19.) He also testified:

> Q. When you -- going back, when you stepped into the living room of the house with Ms. Barner, you testified that it wasn't just out of politeness, right?
> A. Correct.
> Q. It was as part of your investigation?
> A. Correct.
> Q. So when you did that, your aim was to separate her and Mr. Hatcher so you could ask her questions?
> A. Correct.

25

(*Id.* at 41.) Officer Gudenkauf did not testify that he believed there was an emergency. The Government's contention that responding to an emergency motivated his actions is belied by his behavior and his statements. Upon entering, Officers Gudenkauf and Wood continued the interview they had commenced outside the doorway. They first confirmed that Defendant had run back inside (Def. Ex. E at 22:27:49), that he had been in the house a short time (*Id.* at 22:28:13), that Ms. Barner "just got [her] car keys back[8] and [Defendant] said he was going outside to talk to you guys," and then Officer Wood returned to his background questioning by asking for her birthdate. Officer Gudenkauf told Ms. Barner, "Right now we're just investigating." (*Id.* at 22:29:20.) Then they sought and obtained Ms. Barner's consent to look in an upstairs bedroom to determine if Defendant had thrown a gun there. The officers did not appear to undertake any community caretaking functions, such as look for victims or render any assistance, because there appeared no need to do so. As such, I conclude that the officers did not have a subjective belief that an emergency existed and their actions were not motivated primarily by such a belief.

Based on this analysis, I recommend the Court conclude that there was not probable cause to support a concern for the safety of the occupants of the residence or a reasonable belief that an emergency existed. Thus, officers were not justified in entering on this ground.

### 2. Whether There was Probable Cause to Believe Evidence Would be Destroyed

"[T]he exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *King*,

---

[8] The officers did not pursue the significance of Ms. Barner getting her keys back, although it would be consistent with Defendant's reason for lying about driving, if he returned the keys to her possession.

563 U.S. at 469. "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *Leveringston*, 397 F.3d at 1116 (citations omitted). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence . . . will imminently destroy evidence." *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012) (citation omitted). The inquiry is objective and asks, "whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citation omitted). *Cisneros-Gutierrez* held:

> After arriving at the house and announcing themselves, the officers witnessed evasive behavior. Gerardo and Alfonso consulted one another, following which Gerardo's feigned confusion appeared to be a delaying tactic during which Alfonso took several plastic bags to the kitchen sink and disposed of their contents. Taken together these circumstances justified the officers' warrantless entry.

*Id.*

At the hearing, neither of the Government's witnesses mentioned any concern about the destruction of evidence or the concern that someone in the residence would imminently destroy it. For that matter, the Government does not even identify the evidence law enforcement may have considered to be in jeopardy. The warrant application sought permission to seize the following evidence:

- Interior and exterior photographs of the residence;
- Evidence of the shooting including the handgun police had observed;
- Paperwork associated guns or ammunition;
- A purple shirt Defendant had removed (Schlosser Hr'g Test. at 58);
- "Swabs for evidence;" and
- Photographs, buccal swabs, and Defendant's clothing.

(Gov. Ex. 8.) Of course, this list was developed after the gun had been observed in the residence. At the time of the officers' entry, there was no indication that they had reason to believe these items were present, that they might constitute evidence, or that there was some danger of their destruction. The Government's formulation of its position underscores the rather nebulous nature of the officers' concern: "Once officers determined he entered the house for a brief time, they were justified in also entering the house to *ensure* . . . there was no evidence being destroyed." (Doc. 24 at 10 (emphasis added).) The Government does not articulate facts showing that evidence was in danger of being destroyed, only that the officer wanted to ensure no evidence was destroyed.

The Government does not point to any activity in the residence that might have tipped off the officers to the destruction of evidence. *See, e.g.*, *Ramirez*, 676 F.3d at 763 (holding that no exigent circumstances existed because at the time officers sought to gain entry to hotel room by swiping the key card, "they had no indication whatsoever that there was any activity at all in the hotel room, let alone any activity that might lead them to believe that the occupants inside might imminently destroy evidence," in fact, the officers heard "no sounds at all" from the room); *United States v. Sallis*, No. 17-CR-2017-LRR-1, 2017 WL 2819973, at *8 (N.D. Iowa June 29, 2017) (officers heard nothing from apartment to justify warrantless entry based on possible destruction of evidence), *R. & R. adopted* 2017 WL 3388184 (N.D. Iowa Aug. 7, 2017), *aff'd*, 920 F.3d 577 (8th Cir. 2019). *But see United States v. Clement*, 854 F.2d 1116, 1120 (8th Cir. 1988) (holding that magistrate judge and district court could reasonably find that officers could think evidence would be destroyed when they heard "scurrying" through hotel room door). With no evidence that law enforcement knew of any evidence present in the residence, much less any articulable basis to believe it might be destroyed, I recommend the District Court find that destruction of evidence was not an exigent circumstance that justified a warrantless entry into Defendant's residence.

28

### E. Whether the Officers were Justified in Making a Protective Sweep

As the Government points out, "After a lawful entrance, police may conduct a 'protective sweep,' a cursory inspection of the spaces within the residence where a person might be found, if articulable facts support a reasonable belief that some person is in the residence who poses a danger to the officer." Defendant relies on *Maryland v. Buie* for the general proposition that once lawfully present, such a sweep may be justified. 494 U.S. 325 (1990.) Defendant points out that "the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search." *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) (citations omitted). Thus, once law enforcement has entered, a protective sweep for officer safety may be justified. *See United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009) (citing *Buie*, 494 U.S. at 337).

However, the Government needs to show the lawful basis for law enforcement's entry into the protected area in the first place. For the reasons discussed above, I find the Government has not done so. Ms. Barner did not consent to the entry and it was not justified by exigent circumstances. Therefore, the protective sweep is unlawful.

In the event the Court concludes the officers were lawfully present based on consent and/or exigent circumstances, I will address whether the protective sweep was otherwise justified by "a reasonable, articulable suspicion that the house [was] harboring a person posing a danger to those on the . . . scene." *Buie*, 494 U.S. at 336. The Government relies on *United States v. Crisolis-Gonzalez*, where law enforcement entered a residence with the occupants' consent. 742 F.3d 830, 836 (8th Cir. 2014), *as corrected* Feb. 11, 2014. A protective sweep is permitted under the Fourth Amendment when an officer has "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be

swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* (quoting *Cisneros–Gutierrez*, 598 F.3d at 1006 (quoting *Buie*, 494 U.S. at 334)).

In *Crisolis-Gonzalez,* the agents believed the defendant had a gun. *Id.* The occupants were hesitant when asked if others were in the house, making the agents suspicious of potential danger. *Id.* Further, one of the occupants made a slight head turn to the hallway in response to being asked whether anyone else was in the apartment and created further suspicion that other individuals were present. *Id.*

In the case at bar, the Government states the basis for the officers' safety concern as follows:

> Officers were investigating a shooting, from which defendant had fled and then acted suspiciously. Defendant went into the house, came out a short time later, sweating heavily. Defendant lied about the circumstances of his arrival at the house. While he subsequently explained that away as not wanting to admit he was driving without a license, defendant's dishonesty is still a factor that could make a reasonable officer nervous, especially since defendant's lie was about whether there was someone else in the SUV, which could cause a reasonable officer to be concerned defendant was trying to hide the presence of another person by claiming it was his girlfriend. Officers had patted defendant down, but had not found a firearm, though he was an immediate and reasonable suspect in a shooting. While Barner indicated there was no one else in the home, officers had nothing else to corroborate that assertion. Given the tight confines of the home, the danger of ambush, defendant's lie, the suspected presence of an unaccounted for firearm, the time of night, and other factors, officers' were justified in conducting a protective sweep.

(Doc. 24 at 11-12.)

I previously discussed whether the fact that Defendant fled the scene of a shooting and then ran in and out of his house supported probable cause to believe a gun may be present. These facts also bear consideration in assessing the justification for the protective sweep. If officers had been investigating a crime with no reason to suspect a gun would be present, Defendant's actions might be more innocuous. Nevertheless, these

30

facts do contribute to the officers' suspicion that a gun could be present and, therefore, the danger posed if there was an unknown person present to threaten them.

The timing of the protective sweep is problematic, but ultimately not a bar to finding it was justified. Defendant contends the lengthy wait tends to show officers did not regard their safety to be actually threatened when they made the sweep. (Doc. 29 at 10.) There are two aspects to the timing. First, the 36-minute delay between entry and execution of the protective search. Second, the officers' perception of how long it would take for a warrant to arrive. It took some time for law enforcement to make the decision to seek a warrant. If they chose not to seek a warrant there may be no need to enter rooms where someone might be hiding. Officer Gudenkauf announced to Ms. Barner the plan to seek a warrant and "secure" the house with a protective sweep. In a small residence, that announcement might be overheard. If officers had waited for the warrant before entering other rooms, it would give anyone hiding the opportunity to plan an assault. Officer Gudenkauf agreed with the simple formulation "the longer you were there, the more likely it was that an occupant of another room might come out." (Gudenkauf Hr'g Test. at 43-44.) While that might not be true in all instances, under the circumstances presented it was not unreasonable to factor in the timing. The fact that officers waited 36 minutes to make the protective sweep is not unreasonable. Their consideration of the length of time they would remain in the residence before the warrant would arrive was also not unreasonable.

The more difficult issue is the foundation for the officers' suspicion that someone might be lurking in the residence. This suspicion is founded wholly on the discrepancy regarding who fled the shooting. Defendant claimed Ms. Barner drove. Ms. Barner denied having left the house. While Ms. Barner's story seems more plausible—particularly with the aid of hindsight and Defendant's admission—the discrepancy could have raised the suspicion that someone else arrived at the home with Defendant.

31

However, the justification for the protective sweep never rises above a mere suspicion. Aside from the discrepancy in their stories about who drove, Officer Gudenkauf had no reason to suspect there had been another occupant of the SUV. (*Id.* at 29.) Moreover, at the time of the protective sweep, Officer Gudenkauf had no evidence of another person, besides Defendant, having fled to the residence. (*Id.* at 45.)

In considering all the information known to the officers at the time of the protective sweep and the reasonable inferences they could have made, I conclude they did not have "a reasonable, articulable suspicion that the house [was] harboring a person posing a danger to those on the . . . scene." *Buie*, 494 U.S. at 336. The fact that Defendant was sweating heavily and had entered the home before coming back outside do not help establish a reasonable, articulable suspicion about whether someone was hiding inside. The discrepancy about who was driving the SUV raised at most the possibility that a third person left the shooting with Defendant. The Government points to the lack of corroboration of Ms. Barner's account of who was present. The lack of corroboration does not amount to articulable facts that make the Officer's suspicion reasonable. By way of contrast, in *Crisolis-Gonzalez*, the officers pointed to the hesitance of persons present "when asked if others were in the house ignit[ing] the agents' suspicion as to the potential danger." 742 F.3d 836. One of these people also made a slight head turn when asked if anyone else was present further raising the officers' suspicion. *Id.* By way of contrast, the Government can point to nothing about the officers' interaction with Ms. Barner that made them suspect someone was hiding. Therefore, I recommend the Court find that the protective sweep was not justified.

**F.**    ***Whether Ms. Barner's Consent to Seize the Gun Purged any Taint***

The Government argues, "Barner consented to the officers taking [the gun]; essentially consenting to a search for and seizure of the gun." (Doc. 24 at 13.) The Government relies on *United States v. Brandwein*, where the Eighth Circuit held that a

32

consent to a search after and illegal search can, under certain circumstances, vitiate the unlawfulness of entry." 796 F. 3d 980, 985 (8th Cir. 2015.) The Government points to no case where the consent to *seize* an item found in the course of an illegal *search* purged the illegality.

There is a significant and sometimes overlooked distinction between a search and a seizure addressed in *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012). At issue in *Clutter* was the seizure of computers with the consent of the defendant's father from their mutual residence. *Id.* at 983. *Clutter* discussed the details of two searches, one on January 8 and one on January 22. *Id.* at 982-93. The defendant in *Clutter* was investigated for several burglaries. *Id.* On January 8, the defendant led officers to his bedroom and showed them, among other things, computers he admitted stealing and a stack of disks containing files he had downloaded from them. *Id.* at 982. When the investigator later searched the disks to identify burglary victims, he encountered child pornography. *Id.* On January 22, with the defendant in jail, investigators told defendant's father they were concerned three other computers still in the home might contain illegal images. *Id.* at 983. The father told officers he owned the home, invited them in, gave them permission to search, and signed consent forms for the three computers. *Id.* The officers found two computers in common areas and a third in "an area controlled by" the defendant. *Id.* The defendant's motion challenged "the warrantless search *of his home and seizure of three computers* on January 22." *Id.* (emphasis added.) However, on appeal the defendant "argue[d] that the district court erred in upholding the warrantless search and seizure *of his computers* on January 22." *Id.* (emphasis added.)

> There is no evidence that the officers *searched* the computers before obtaining an unchallenged warrant authorizing the search. The distinction, though often overlooked, is important:

> Although our Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, there are important differences between the two. . . . The Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter. As a matter of timing, a seizure is usually preceded by a search, but when a container is involved the converse is often true. Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession.

*Id*. at 984 (citing *Texas v. Brown*, 460 U.S. 730, 747–48 (1983)). *Clutter* held

> First, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." In this case, Clutter was in jail on January 22. A temporary seizure of the computers while the officers applied for a search warrant did not meaningfully interfere with his possessory interests. Joel Clutter, who was in actual possession of the computers in his home, consented to their seizure, indeed, he asked the officers to take them from the home. Viewed from this perspective, no Fourth Amendment "seizure" occurred.

*Id*. at 984–85 (citations omitted).

It is not clear how consenting to the seizure of the gun purges the taint of a prior illegal search as the Government urges. At most, Ms. Barner consented merely to seizure of the gun. Officer Schlosser entered the residence at about 11:45 p.m. (Def. Ex. F 23:45:17.) Very quickly thereafter he asked Ms. Barner, "Would you give us permission to get that gun?" To which she responded, "Yes. Please take it." (*Id*. at 23:45:39.) As in *Clutter*, this temporary seizure while officers obtained a warrant would not "meaningfully interfere with [Defendant's] possessory interests." *Id*. However, the search that preceded the seizure was a meaningful interference with Ms. Barner's and Defendant's privacy interests. It would torture the law, the facts, and the sequence of

34

events to interpret Ms. Barner's consent to the seizure as consent to the prior search that had invaded her interest in maintaining personal privacy. Ms. Barner's consent to seize the gun was limited to just that: a seizure. Nothing about her statements imply that she consented to or waived any objection to the prior police conduct. As Defendant points out, it is difficult to see where the line would be drawn if the Government's position is correct:

> [T]he government's proposed rule in this case also amounts to a system in which an illegal search and seizure con [sic] be completely conducted without a warrant, so long as a person with some right to consent to the search later gives it their stamp of approval on the basis of its findings.

(Doc. 29 at 14.) Indeed, the resulting rule would be more concerning than Defendant argues. An illegal search could be conducted without a warrant or consent and would become valid so long as someone with authority subsequently consents to the seizure of the evidence or contraband. For example, law enforcement could randomly stop cars and search their trunks for contraband, but if a driver consented to the seizure of narcotics found in the trunk, the consent to the seizure would validate the search.

In addition, even if a consent to a seizure could purge the taint of a prior search, the factors set forth in *Brandwein* do not support such a conclusion.

> To vitiate the unlawfulness of an entry, consent to a search must be both voluntary and "an intervening independent act of a free will" sufficient "to purge the primary taint of the unlawful invasion." *Brown v. Illinois*, 422 U.S. 590, 598, 95 S. Ct. 2254, 45 L. Ed.2d 416 (1975) (internal quotation marks omitted); *see United States v. Greer*, 607 F.3d 559, 563–64 (8th Cir.2010). Whether consent sufficiently disperses the taint of an unlawful entry is determined by reference to "temporal proximity" between the entry and the consent, "the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S. Ct. 2254 (internal citation omitted).

*Brandwein*, 796 F.3d at 985.  We measure temporal proximity from the point at "which the [agents' conduct] became illegal to the time of the consent."  *United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir. 2007).  In the instant case, the Government focuses on the time between the officer's entry and the discovery of the gun.  While it may have been an hour after the officers first stepped inside the residence, it ignores other relevant circumstances.  The initial entry was not the only "unlawful invasion."  I have concluded the protective sweep was also unlawful.  Ms. Barner's alleged consent to seize the weapon occurred approximately half an hour after the prospective sweep.  This is longer than the fifteen minutes the Eighth Circuit has previously deemed "sufficient to demonstrate an attenuation of the illegality." *United States v. Whisenton*, 765 F.3d 938, 941–42 (8th Cir.2014).  However, I find the surrounding circumstances and the alleged intervening events were not conducive to the necessary attenuation.

As the evening wore on, Ms. Barner became more resistant to the police presence. I have previously found that she had not consented to the police entry.  At one point she asked if the officers could wait outside.  Immediately before the sweep, she adamantly denied the officers permission to make the sweep.  (Def. Ex. F at 23:03:25.) Nevertheless, officers made clear they believed her consent was unnecessary.  The intervening events the Government points to might point to her desire to have the gun removed, but not to the search itself. After the gun was located, the officers did not complete the sweep of the basement or release Ms. Barner, her uncle, and her son from their detention in the living room.  Rather, the police and the three detainees waited in the living room while officers guarded them and the gun.  The detainees were refused permission to leave the living room because of the officers' concern about them destroying evidence.  Ms. Barner's concern about having a firearm in the house may have motivated her consent to the seizure, but not the prior search.  To the contrary, Ms. Barner was well-aware of the officers' suspicion about the possible presence of a gun and

continued to resist the search throughout the encounter. Officer Schlosser arrived and almost immediately asked Ms. Barner to consent to seizure of the gun. Without waiting, she said, "Yes. Please take it."

The Government points to discovery of the gun and Ms. Barner's concern about having a gun in the house as intervening circumstances that would dissipate the taint of the prior illegality. (Doc. 24 at 14.) Her concern about the presence of a gun in the house certainly motivated her willingness to have Officer Schlosser seize it. It is less clear how the discovery of the gun and her concern about guns dissipated the illegality of the prior search. She expressed earlier in the interaction that she did not allow guns in the house. (Def. Ex. E at 22:30:45.) Despite this concern and the officers' evident desire to search for the gun, she maintained her resistance to the search. I cannot conclude that the presentation of this *fait accompli* is an intervening circumstance that made Ms. Barner's consent to seize the gun an "intervening independent act of free will" sufficient "to purge the primary taint" of the unlawful invasion that resulted in its discovery. *Brown,* 422 U.S. at 598.

Finally, I respectfully disagree with the Government's assessment of the flagrancy of the misconduct. The officers were no doubt deeply concerned about locating the shooter and the weapon. The officers' conduct was not flagrant in the sense they were unprofessional or disrespectful of the occupants. On the contrary, they seemed sympathetic with Ms. Barner's concern about scaring her son and took pains to try and explain events as they transpired. As Officer Gudenkauf credibly testified, he was motivated by a desire to separate Ms. Barner from Defendant to "get an honest statement out of her." (Gudenkauf Hr'g Test. at 19.) While this is undoubtedly a legitimate investigative technique, the explanation does not account for the fact that the officers achieved the desired separation by entering a constitutionally protected area. Having reviewed the video of the initial entry multiple times, I find the official misconduct

flagrant in the sense that they could not have reasonably formed a belief that Ms. Barner consented to their entry into the residence in response to the statement, "Let's step inside for a second." As I have concluded, her response did not constitute consent. Nevertheless, this alleged consent was the only basis for the officer's presence in the house and "for a second" stretched on for more than an hour.

Ultimately, the issue comes back to the question posed in *Wong Sun*: whether Ms. Barner's consent to seize the gun was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). Having considered all of the circumstances, I recommend the Court conclude her consent to seize the gun was not the product of the act of free will sufficient to purge the taint of the primary invasion.

### G.     *Whether the Officers Relied in Good Faith on the Warrant*

The Government asserts that the evidence need not be suppressed because the officers executing it did so with objectively reasonable belief in its validity pursuant to the good faith exception to the exclusionary rule under *United States v. Leon,* 468 U.S. 897, 907 (1984). Ordinarily, "[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, 'cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *United States v. Calandra*, 414 U.S. 338, 347, (1974)). The exclusionary rule is subject to an exception "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even if the warrant is subsequently invalidated. *Leon*, 468 U.S. at 920. The Eighth Circuit has held:

> We have applied *Leon* where, as here, the search warrant application cites information gathered in violation of the Fourth Amendment. *See, e.g.*, *United States v. Kiser*, 948 F.2d 418, 421 (8th Cir. 1991); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant

to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242–43 n. 6 (8th Cir. 1994)).

*United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013).

In *Cannon*, the Court assumed law enforcement violated the defendant's rights by initially entering a place where he had a reasonable expectation of privacy. *Id.* at 413-14. Indeed, for *Leon* to apply in the instant case, the officer's entry into the home or the later protective sweep must have violated Defendant's Fourth Amendment rights. I have found above that these actions were in violation of the Defendant's rights. The issue is whether the agents' prewarrant conduct was "close enough to the line of validity" to make their belief in the validity of the warrant objectively reasonable. *Id.* at 413. Here, a comparison to *Rodriguez (C)* is helpful because it analyzed the *Leon* good faith exception where a warrant was obtained after officers entered without consent and then conducted an unlawful protective sweep. With respect to the consent to enter, *Rodriguez (C)* held:

> Here, suppression based on the officers' warrantless entry was improper. The body-camera video shows that, based on Rodriguez's behavior, the officers' belief he consented to their entry was objectively reasonable. Although Rodriguez did not affirmatively express consent to the officers' entry—either verbally or nonverbally—he also did not try to close the front door, or protest when [Officer] Lutter and another officer followed him into the house. Moreover, ***when Lutter asked if he could step into the house to talk with Rodriguez, Rodriguez immediately opened the screen door wider with one hand, and walked inside with his back to the officers. An***

> **objectively reasonable officer could interpret that series of actions as an invitation to enter.** *See United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010) (holding that when defendant "opened the door to the porch and stepped back, he impliedly invited the officers to enter"); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) ("[T]he action of [the defendant] in the opening of the door and stepping back constituted an implied invitation to enter."). The officers were close to the line of validity, and had a good faith, objectively reasonable belief that Rodriguez gave consent to enter his home. *See Pena–Ponce*, 588 F.3d at 584 (noting that consent may be inferred by defendant's conduct). The district court erred in suppressing the evidence gained from entering Rodriguez's home, especially the "overwhelming" smell of marijuana. *See Conner*, 127 F.3d at 667 (upholding suppression of evidence because "[n]o officer could in good faith believe, under the facts as they existed at the time, that the defendants consented to the officers' visual or physical access to the motel room" (alteration in original)).

*Rodriguez*, 834 F.3d at 941 (emphasis added). I find the instant case factually distinguishable from *Rodriguez* with regard to how close to the line of validity the actions of Officers Gudenkauf and Wood were. In *Rodriguez (C)* the Court noted the officer "asked Rodriguez if they could 'step in and talk real quick.'" *Id.* at 939. Although the defendant's response was ambiguous ("[I would] like to ask what it's about first"), the defendant at least had some opportunity to respond to the request. *Id.* As discussed above, Officer Gudenkauf's statement, "Let's step inside," was not clearly a request and Ms. Barner did not have any opportunity to respond before the officers moved inside. More importantly, in *Rodriquez (C)* the defendant gave some affirmative indication of his consent by immediately opening the screen door wider and walking inside with his back to the officers. *Id.* at 941. Nothing about Ms. Barner's behavior could be reasonably interpreted to constitute consent to entry.

In *Rodriguez (C)*, the Government did not assert the officers had a reasonable suspicion of dangerous individuals present to justify the protective sweep. *Id.* at 942. Rather, the Government argued that suppression was not required because of the *Leon*

exception. *Id. Rodriguez (C)* held, "Here, a protective sweep in the absence of an arrest or reasonable suspicion of dangerous individuals was clearly illegal under [*United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)]. The *Leon* good faith exception does not apply." *Id.* Here, I have concluded that the officers did not have a reasonable suspicion of dangerous individuals present in the residence and thus the sweep was clearly illegal. Therefore, the evidence resulting from that search, including the gun and magazine on the stairway, should be excluded.

## H.    *Whether Defendant is Entitled to a* **Franks** *Hearing*

The *Franks* issue arises under unusual circumstances. *Franks* held that, under certain circumstances, a defendant is entitled to a hearing to "challenge the veracity of a sworn statement" police used to obtain a search warrant:

> In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant. We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155–56 (emphasis in original). Showing deliberate or reckless falsehood is "not lightly met." *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (quoting *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987)). A defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false; and [the allegations] should be accompanied by a statement of supporting reasons." *Id.* (quoting *Franks*, 438 U.S. at 171) (alterations in original).

Here, Defendant asserts the *Franks* hearing is contingent[9] upon the Court's suppression ruling. In other words, if the Court suppresses the discovery of the gun and excises that information from the warrant affidavit, then the Court should excise two pieces of false information and add in one omitted fact. The product of this exercise, Defendant alleges, would result in a warrant that fails for want of probable cause. If evidence of the gun is not suppressed, however, Defendant concedes the warrant established probable cause regardless of the errors or omissions.

The Government contends that no *Franks* hearing is necessary because Defendant has not made a substantial preliminary showing of a deliberate or reckless misstatement or omission. At the commencement of the hearing, I concluded Defendant had not made such a showing and denied the request for a *Franks* hearing. I took under advisement whether Defendant was entitled to a contingent *Franks* hearing if evidence of the gun is suppressed.

I confirm now my conclusion that Defendant is not entitled to a *Franks* hearing. The affidavit states that Officer Dura saw the driver exit the SUV and run toward the railroad tracks when, in fact, this behavior had been reported by other witnesses. If this information had been attributed to an unknown witness it might have been slightly less credible. Given the other evidence in the affidavit about Defendant fleeing from the shooting, I conclude this alleged error is immaterial. The affidavit also omitted Defendant's explanation for why he had lied about driving (i.e., that he did not have a valid driver's license). The affiant is not required to include every piece of information

---

[9] The Defendant's post-hearing brief asserted: "The undersigned was unable to locate a case addressing a 'contingent' *Franks* motion of the kind presented here, where a defendant conceded he would not be able to show that a warrant affidavit, stripped of misrepresented evidence under *Franks*, did not establish probable cause unless a collateral suppression issue was also decided in his favor, but argued that, if the collateral issue were decided in his favor, he would be able to make such a showing." (Doc. 29 at 16.)

known to him. *See Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001); *United States v. Walton*, No. 07-CR-14-LRR, 2007 WL 2301252, at *5 (N.D. Iowa Aug. 8, 2007) (citing *Tech. Ordnance*, 244 F.3d at 649). With Defendant's explanation, the warrant would still be supported by probable cause, if the presence of the gun was not suppressed. Finally, Defendant conceded at the hearing that the misidentification of Ms. Barner's uncle in the affidavit is immaterial. (Cross Argument at 8.)

Moreover, the Government's concession at the hearing makes a *Franks* analysis and, therefore, a *Franks* hearing unnecessary. The Government concedes the warrant lacks probable cause if the gun is suppressed, rendering the *Franks* issue moot. The Court could treat the *Franks* issue as moot because of the parties' concessions. Or, the Court could treat the parties' respective concessions as, in effect, a stipulation that no *Franks* hearing is necessary. Ultimately, I find no *Franks* hearing is necessary and Defendant's motion for a hearing should be denied.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **Grant in Part and Deny in Part** Defendant's Motion to Suppress Evidence, Request for Evidentiary Hearing, and Motion for *Franks* Hearing. **(Doc. No. 19.)** Specifically, I recommend the motion to suppress be **GRANTED** and the motion for a *Franks* Hearing be **DENIED.** The Court previously granted Defendant's motion for an evidentiary hearing on issues other than *Franks*. (Doc. 23.)

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object

to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

  **DONE AND ENTERED** at Cedar Rapids, Iowa, this 5th day of February, 2020.

_____

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa