**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-CR-1036-CJW-MAR |
| vs. | **ORDER** |
| CAMERON HATCHER, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................... 2

II.   STANDARD OF REVIEW................................................................ 2

III.  FACTUAL BACKGROUND ............................................................ 6

IV.   ANALYSIS.......................................................................... 12

      A.   Consent to Enter the Home.................................................. 13

      B.   Exigency as Justification to Enter the Home ................................ 18

      C.   Propriety of the Protective Sweep.......................................... 22

      D.   Consent to Seizure of the Firearm as Purging
           Unconstitutional Conduct .................................................. 25

      E.   Good Faith ................................................................ 27

V.    CONCLUSION....................................................................... 29

## I.     INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 33) of the Honorable Mark A. Roberts, United States Magistrate Judge.   On December 23, 2019, defendant filed a motion to suppress and request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).   (Doc. 19).   On December 24, 2019, the government requested and was granted an extension of time to file a resistance. (Docs. 21 & 22).   On January 2, 2020, the government timely filed a resistance.   (Doc. 24).   On January 8, 2020, Judge Roberts held a hearing on defendant's motion.   (Doc. 25).   On February 5, 2020, Judge Roberts issued his R&R, recommending that the Court grant defendant's motion to suppress and deny his motion for a *Franks* hearing.   (Doc. 33, at 43).   The deadline for filing objections to the R&R was February 19, 2020.   On February 19, 2020, the government filed its objections to the R&R.   (Doc. 34). Defendant did not file any objections.

For the following reasons, the Court **overrules** the government's objections (Doc. 34), **adopts** Judge Roberts' R&R without modification (Doc. 33), **grants** defendant's motion to suppress, and denies defendant's request for a *Franks* hearing (Doc. 19).

## II.     STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.   A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).   While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has concluded that general objections require "full de novo review" if the record is concise. *Id.* ("Therefore, even had petitioner's objections lacked specificity, a de novo review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate.").

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to FED. R. CIV. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed.   In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"   *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).   Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").   In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed.   *See Thomas*, 474 U.S. at 153–54.   Thus,

although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III.   FACTUAL BACKGROUND

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R.   (Doc. 33, at 2-10).   Further, neither party objects to the R&R's factual findings.   Thus, the Court adopts the R&R's factual findings without modification.   (*Id.*) (footnotes in original).

> At about 10:30 p.m. on June 16, 2019, the Dubuque Police Department received reports of a shooting[1] at a gathering in the 2400 block of White Street in Dubuque.   (Def. Ex. G (Appl. for Search Warr.).)   As police arrived, people were dispersing by foot and in vehicles, including a small dark SUV.   An unidentified witness followed the vehicle from the scene while speaking to the police dispatcher.   This reporting witness gave the SUV's license plate to the police dispatcher and the vehicle was determined to be registered to Misty Marie Barner of 1331 Pine Street.
>
> Officer Justin Dura was responding to the shooting when he learned about the small dark SUV fleeing at a high rate of speed.   (Def. Ex. B (Dura Report).)   Officer Dura was told the vehicle was parked in the 1300 block of Elm Street.   People in the area redirected him to the 1300 block of Pine Street where he located the SUV and determined no one was inside. (*Id.*)   Officer Dura did not see anyone leaving the vehicle.
>
> Officer Gudenkauf found the SUV parked on Pine Street at about the same time as Officer Dura.   (Def. Ex. D (Gudenkauf Report).)   They learned that a witness had reported that someone had parked the SUV and fled from it.   Over his radio, Officer Gudenkauf learned that someone had fled from the black SUV.   (Gudenkauf Jan. 8, 2020 Hr'g Test. at 26.)
>
> Defendant, who was ultimately determined to be a resident of 1331 Pine Street, came out of the house and approached Officer Dura.   (*Id.* at 18, 29.)   Defendant was "very nervous, speaking very fast, and was very sweaty."   (*Id.* at 18.)   Defendant's behavior and appearance raised "red flags" for Officer Gudenkauf that he might be somehow involved in the

---

[1] Defendant was ultimately ruled out as the shooter and another suspect was charged in state court.   (Schlosser Jan. 8, 2020 Hr'g Test. at 59-60.)

shooting.  (*Id.*)  Defendant told officer Dura he had just arrived in the SUV after hearing shots fired in the 2400 block of White Street.  Defendant told Officer Dura that his girlfriend, Misty Barner, had been driving. Officer Gudenkauf testified he overheard Defendant telling Officer Dura that Ms. Barner had driven from the scene of the shooting.  (*Id.* at 45-46.) Defendant's statement to Officer Dura on this issue can be heard on the Officer Gudenkauf body camera audio.  (Def. Ex. E at 22:25:17.)

Meanwhile Officer Gudenkauf and Officer Wood spoke with Ms. Barner in the residence and learned that she had not been with Defendant at the gathering.  (*Id.* at 46.)  When confronted with this discrepancy, Defendant admitted he had driven himself and claimed to have lied because he did not have a valid driver's license.

The interaction between Officer Gudenkauf[2] and Ms. Barner is central to this dispute.  While Officer Dura spoke with Defendant, Officers Gudenkauf and Wood went to speak with Ms. Barner in the residence.  (*Id.* at 19.)  When Ms. Barner opened the door, Officer Gudenkauf testified that he "asked Ms. Barner to step inside the house," with the intention of visiting with her outside of Defendant's presence.  (*Id.*)  He testified that Ms. Barner let the officers in without protest, hesitation, or reluctance. (*Id.* at 19-20.)

I find Defendant's characterization of Officer Gudenkauf's video[3] of this entry to be reasonably accurate:

> Wood[4] then stated, after scarcely a minute had gone by: "Let's step inside and talk for a second."  Barner stepped backwards as officers stepped toward her, not turning her back but retreating a few feet into her living room, while officers stepped in front of her and stood close to her, a few feet inside her doorway, in her living room.

---

[2] Officer Gudenkauf was acting as a field training officer for Officer Wood who was with Officer Gudenkauf for most of this interaction.  Officer Wood did not testify.

[3] All references to "videos" are to the officers' individual body camera videos.

[4] I find it was actually Officer Gudenkauf who stated, "Let's step inside and talk for a second." From repeated viewing, I believe the voice matches Officer Gudenkauf's at other points where it is clearly him speaking.  In addition, Officer Gudenkauf slightly interrupts Officer Wood's questioning to make this statement.

(Doc. 29 at 6 (citing Def. Ex. E at 22:27:40-22:27:47.)[5].) I find the entrance occurs at 22:27:39 as shown in Officer Gudenkauf's video. (Def. Ex. E.) Officer Gudenkauf's description of the moment of entry and the Government's description of the entry do not match the video evidence. Officer Gudenkauf testified:

> Q. Did she, in fact, just step in and kind of hold the door or at least gesture for you to come in as well?
>
> A. Correct.

(Gudenkauf Hr'g Test. at 20.) The Government stated, "Gudenkauf requested that Barner, Wood, and he step inside to talk. Barner did not object or voice any concern over this request. Instead, as shown on Gudenkauf's body camera footage, she immediately turned and went into the house, followed by the two officers." (Doc. 24 at 9.) The video shows no protest by Ms. Barner. Whether she "seemed reluctant" is, of course, somewhat subjective. Moreover, she was not given an opportunity to express reluctance, objection, or concern as the two officers entered. She had earlier expressed her confusion about what was happening. Having reviewed the video of the moment of entry many times, I find that she did not turn and walk into the residence. Rather, she stepped backward as the officers advanced, although she may have turned slightly during this process. She made no gestures, although as the officers are entering, she did touch her face or glasses. She clearly did not hold the door for the officers. There was no screen door present. The door hung open as she talked to the officers. At different times in the video, as people open and close it, it is apparent that the door need not be held open.

Officer Gudenkauf told Ms. Barner he was investigating a shooting. (Gudenkauf Hr'g Test. 33.) Officer Gudenkauf soon learned Ms. Barner and Defendant were boyfriend and girlfriend. (*Id.* at 20.) Ms. Barner reported that she had been home all night and was in her bedroom with her son when Defendant entered the residence and left again shortly thereafter. (*Id.*) While Defendant had briefly been in the house, he went up to Ms. Barner's bedroom, opened her bedroom door, and shut it. She did not know where else in the house he might have gone. This seems to have

---

[5] Both parties have offered Exhibits containing body camera video. The videos appear to depict the same events; however, the versions offered by Defendant have additional time markings that are not shown on the Government's versions of those videos I reviewed. I have principally relied on the Defendant's exhibits with the time markings that appear to correspond with actual time (i.e. beginning at about 22:21 (10:21 p.m.) on June 16, 2019). (Def. Ex. C.)

raised a concern with the officers that Defendant might have thrown a gun in the bedroom. (*Id.* at 34.) Ms. Barner gave the officers permission to quickly look in the bedroom. (*Id.* at 21.) Ms. Barner told officers there were two other people in the residence, her juvenile son and her uncle. (*Id.* at 35.) The officers made a quick inspection of the bedroom and then returned to the living room. (*Id.* at 21.) Officer Gudenkauf asked Ms. Barner if he could walk around the rest of the house, but she declined to give him permission. (*Id.*) Officer Gudenkauf testified he wanted to make a protective sweep because of the nature of the crime they were investigating (i.e., a shooting) and the concern that someone could have returned to the residence from the shooting with Defendant. (*Id.*)

At 22:50:30 of Officer Gudenkauf's video, Ms. Barner had been sitting alone on the sofa when she stood up and began moving around the living room. (Def. Ex. E.) She was instructed not to move around because of the officers' concern regarding a suspected gun. Ms. Barner stated, "Can you go outside?" (*Id.* at 22:50:47.) She also stated, "I let you come inside my house to look at stuff and now you tell me I can't move around my house." (*Id.*)

Officer Gudenkauf testified he did not immediately perform a protective sweep because he was not certain the vehicle had been involved in the shooting. (Gudenkauf Hr'g Test. at 22.) Instead, he went outside to speak with Officer Dura while Officer Woods remained inside with Ms. Barner. (*Id.*) Officer Dura had just confirmed with their supervisor that Ms. Barner's SUV was involved in the shooting. (*Id.* at 23.) The officers on the scene concluded they would, therefore, be required to remain for "an extended period of time" that might include the time necessary to apply for a search warrant. (*Id.*) Ultimately, Officer Gudenkauf performed what he considered a protective sweep. The known occupants of the house were gathered in the living room and then Officer Gudenkauf checked the other rooms in the house "to ensure there was no one else that could present a danger." (*Id.* at 23.) Other than the [sic] Ms. Barner, her son, and her uncle, the officers had no knowledge there was anyone else in the house. (*Id.* at 36.)

Officer Gudenkauf estimates about 20 minutes passed before he decided to gather the home's occupants in the living room. (*Id.* at 41.) Officer Gudenkauf's video is divided in two segments: Government Exhibits 1 and 3 and Defendant's Exhibits E and F. The first video covers the first part of his interaction at the scene. Officer Gudenkauf and Officer Wood enter the residence at 22:27:39. (Def. Ex. E.) At the end of the

first video, Officer Gudenkauf had just left the residence, perhaps to consult with other officers. The second segment of Officer Gudenkauf's video begins when he reenters the residence. (Def. Ex. F.) At 23:03:25, he told Ms. Barner of his plan to secure the house by detaining everyone and gathering them in one room. (*Id.*) At this point, Ms. Barner clearly refused the officers her consent to the sweep. The actual process of gathering Ms. Barner's son and uncle gets underway rather slowly because Ms. Barner was reluctant and the officers were trying to induce her to cooperate. It appears Officer Gudenkauf consulted with someone during an unrecorded interval between the two video segments. Nevertheless, based on the video time stamps, I find that approximately 36 minutes elapsed from the time officers first entered the residence until they announced their intention to secure the residence and make a protective sweep.

Officer Gudenkauf explained that he did not immediately secure the house because he did not know if the SUV was involved in the shooting. (Gudenkauf Hr'g Test. at 42.) During this 36-minute interval, Officer Gudenkauf believed he did not have enough information to conduct a protective sweep. (*Id.*) It was not until he learned from his supervisor through Officer Dura that the vehicle had been involved in the shooting that he concluded officers would be on the scene for a long period of time and potentially subject to assault by people hiding in the residence. (*Id.* at 43.)

At the end of the sweep, the only remaining door left unchecked was a closed door that led from the living room to the top of the basement steps. (*Id.* at 23.) When Officer Gudenkauf attempted to open it, it proved to be blocked. Looking through the partially opened door, he observed a television blocking it and a black semi-automatic handgun sitting on the top step which he announced was in plain view. (*Id.* at 23-24; Def. Ex. F at 23:10:30.) Officer Gudenkauf saw dust covering everything (except the gun) and cobwebs stretched across the steps, which indicated to him nobody had been downstairs recently. (*Id.* at 24.) Officer Gudenkauf did not attempt to force the door open and inspect the basement because the cobwebs and dust indicated no one had gone down the stairs. (*Id.* at 25.) Rather, one of the officers stood near the door until the gun was later seized. Although Officer Gudenkauf could have reached the gun, he did not do so because, at that point, he knew law enforcement would be applying for a search warrant. (*Id.* at 38.) From where Officer Gudenkauf stood outside the door he was unable to see whether anyone was in the basement and he did not know if there was an exterior entrance to the basement. (*Id.* at 40.)

Officer Nicholas Schlosser is assigned to the Criminal Investigations Division of the Dubuque Police Department and is an ATF task force officer. (Schlosser Jan. 8, 2020 Hr'g Test. at 48.) He testified that he is experienced in firearms investigations. He was off duty at the time of the shooting but was called in shortly thereafter. (*Id.* at 48-49.) He traveled to 1331 Pine Street after learning the gun had been found. (*Id.* at 51.) When Officer Schlosser arrived, he told Ms. Barner that he was potentially investigating a homicide. (*Id.* at 55-56). He testified that he asked Ms. Barner for permission to take the gun and she granted such permission. (*Id.* at 56.) Rather than immediately seize the gun, Officer Schlosser conferred with his captain who decided to seek a search warrant before seizing it. (*Id.* at 57.)

The application sought authority to search the SUV and the residence for evidence associated with the shooting, including, in pertinent part, the handgun and magazine seen by the police in the residence. (Gov. Ex. 8.) The affidavit was sworn to by Corporal Kurt Horch who did not testify at the hearing. His affidavit briefly describes the shooting, the fleeing SUV, and the investigation at 1331 Pine Street, including Officer Gudenkauf's observation of the gun.

Defendant identifies three errors or omissions in the affidavit: (1) the affidavit states that Officer Dura saw the driver exit the SUV and run toward the railroad tracks when, in fact, this behavior had been reported by other witnesses; (2) the affidavit omitted Defendant's explanation for why he had lied about driving (i.e., that he did not have a valid driver's license); and (3) the affidavit identifies one of the occupants of the residence as Ms. Barner's father rather than as her uncle. I find Defendant has correctly identified each of these items as an error or omission. Officer Dura did not, according to his report, see the driver flee the vehicle. (Gov. Ex. 5.) His report says that he was advised of this fact and his video shows he encountered Defendant later. The affidavit does not include Defendant's explanation for his lie. Ms. Barner's uncle, not her father, was present in the residence. The significance of these errors and the omission will be discussed, as necessary, below.

I note an additional possible discrepancy in the affidavit, which was subject to some testimony but never adequately explained. The affidavit states, "The magazine appeared to have been jarred loose, as if the gun was tossed there, and not placed." (Gov. Ex. 8 at 3.) Neither Officer Schlosser nor Officer Gudenkauf testified that the magazine was dislodged.

After obtaining the search warrant shown in Government's Exhibit 8, Officer Schlosser returned to the residence at 1331 Pine Street, served the warrant and seized the gun along with a purple shirt Defendant had been wearing. (*Id.* at 57-58.)

Officer Schlosser also testified that City of Dubuque traffic cameras showed Defendant in the SUV pull up to a corner where the shooting happened, and then immediately flee at a high rate of speed. (*Id.* at 58-59.) This made Officer Schlosser suspect a possible drive-by shooting. (*Id.*) Defendant was transported to the Dubuque Law Enforcement Center where he gave a voluntary interview. When confronted about the gun found on the stairs, Defendant stated he kept the gun at the top of the stairs for protection. (Gov. Ex. 7 at 4.)

## IV. ANALYSIS

In its objections, the government argues that Judge Roberts erred in concluding (1) that Barner did not consent to the officers' entry into the home, (2) that exigency for safety or preservation of evidence did not justify the officers' entry into the home, (3) that the protective sweep of the home was not justified, (4) that Barner's consent to seize the firearm did not purge any prior illegal conduct by the officers, and (5) that the good faith exception created in *United States v. Leon*, 468 U.S. 897 (1984), did not apply. (Doc. 34, at 1-4).[6] The Court will address each argument in turn.

As an initial matter, neither party has timely objected to Judge Roberts' finding that defendant is not entitled to a *Franks* hearing. (Doc. 33, at 41-43). Thus, the parties have waived their rights to a de novo review of this finding. *See, e.g.*, *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001) (citation and internal quotation marks omitted). Therefore, the Court reviews this section of the R&R for clear error. *See id.* The Court finds no clear error here. Thus, the Court **adopts** the R&R's finding on this issue without modification. (Doc. 33, at 41-43). Defendant's motion for a *Franks*

---

[6] The Court notes that the government's objections are primarily conclusory restatements of arguments already raised. The government also cites no substantive authority in its objections.

hearing is **denied**.  (Doc. 19).

### A.    Consent to Enter the Home

The R&R held that Barner did not explicitly or implicitly give consent to the officers to enter the home.  (Doc. 33, at 13-17).  The R&R noted that the scene was illuminated by police lights and that the officers were in full uniform with holstered weapons.  The officers knocked on the door and Barner answered and expressed confusion about what was going on.  After questioning Barner for just over a minute, Officer Gudenkauf stated, "Let's step inside and talk for a second."  (Ex. E at 4:20). The R&R noted that, although this statement is somewhat ambiguous, it was not phrased as a question.  The R&R also noted that the officers immediately began moving forward into the home and that, although they were polite and non-coercive, neither officer waited for any sign of consent.  Barner did not open the door wider for the officers or lead them into the home; she merely backed up and adjusted her glasses as the officers moved forward into the home.  Ultimately, the R&R concluded that Barner's mere failure to object to the officers' entry did not constitute consent.  (Doc. 33, at 13-17).

The government objects, arguing that Barner implicitly consented to the officers' entry by "turning slightly to lead the way into the house and voicing no objection or complaint to their entry following their request."  (Doc. 34, at 1-2).  The government also asserts that Barner indicated her consent by later allowing the officers to search her bedroom.  (*Id.*).

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  A warrantless search of a home is presumptively unreasonable.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  Thus, a warrantless entry into a home violates the Fourth Amendment if neither consent or exigency are present.  *Steagald v. United States*, 451 U.S. 204, 211 (1981).  Evidence

resulting from an illegal entry into a home is therefore inadmissible and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963).

A person may validly consent to the search of a home so long as such consent is "freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Rambo*, 789 F.2d 1289, 1296 (8th Cir. 1986). Voluntariness requires "an essentially free and unconstrained choice" by the person giving consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). In assessing the voluntariness of consent, courts should look to the totality of the circumstances. *Id.* This includes consideration of the environment and nature of the consent. *United States v. Zamoran-Coronel*, 231 F.3d 466, 468-69 (8th Cir. 2000). Courts should also examine the characteristics of the person giving consent, including:

> (1) [the person's] age; (2) his general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his *Miranda* rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the police had [the person] in custody or under arrest at the time; (10) whether he consented in public; and (11) whether [the person] was silent during the search.

*United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010). "Voluntary consent may be express or implied." *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006). Implied consent may be inferred from a person's "words, gestures, or other conduct." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009). The ultimate question is whether "a reasonable officer would believe consent was given." *Id.*

Inference of implied consent to enter a home requires carefully consideration of the facts at hand. In *United States v. Rodriguez*, the Eighth Circuit Court of Appeals found implied consent was present. 834 F.3d 937, 941 (8th Cir. 2016). There, two

officers in plain clothes knocked on the defendant's door and the defendant came out to his porch, closed the door behind him, and held open his screen-door. After the officers asked twice to go inside to talk, defendant wordlessly turned around, opened the door, went into the house, and held open the screen door. *Id.*, at 939-41. It was thus reasonable for the officers to infer that the defendant intended for them to follow him into the house. In *United States v. Serabia-Ferrel*, however, such consent was not present. No. 11-174 (DSD/FLN), 2011 WL 3625140, at *3 (D. Minn. Aug. 17, 2011). There, the defendant and a third-party opened their door to find seven officers on their doorstep, some of whom were in SWAT gear brandishing assault rifles. *Id.* After the officers asked twice to enter, the pair wordlessly stepped away from the door. *Id.*, at *1. The court there found that the totality of the circumstances showed that the officers could not have reasonably believed that the defendant consented to their entry. *Id.*, at *3.

Although this is not the most clear-cut case, the Court finds that Barner did not consent to the officers' entry here. Explicit consent was plainly absent. As to implied consent, it is notable that the officer's statement before entering was not phrased as a question, unlike both *Rodriguez*, 834 F.3d at 939-40, and *Serabia-Ferrel*, 2011 WL 3625140, at *1. Setting aside the context here, it is generous to characterize the phrase "Let's step inside and talk for a second" as a request. Although the language itself implies some joint or equal action, it also implies some level of insistence. *See Williams v. United States*, 263 F.2d 487, 849 (D.C. Cir. 1959) (finding a person's failure to object to an officer's statement "I don't want to discuss my business out in the hallway, let's go inside where its private" was not a consent to search); *United States v. Roldan*, No. 97 CR. 567(JFK), 1997 WL 767564, at *6 (S.D.N.Y. Dec. 11, 1978) (finding an officer's use of the imperative form "let's look in the bag" was a command and the defendant's acquiescence did not constitute consent to search the bag). In context, that implied insistence combined with the lack of opportunity to object gives the statement the effect

of a command. Barner had no time to respond either affirmatively or negatively before the officers advanced.

The Court also finds that, although Barner turned slightly as the officers entered the home, her movement and positioning did not imply her consent for them to enter. In fact, quite the opposite. The door to the residence is in the corner of the room with a couch to the left side, a wall and another doorframe to the right, and a wall directly in front of the door several feet into the room. (Ex. E at 29:30). Therefore, to enter the house, a person can either move diagonally to the left (between the couch and the front wall) or diagonally to the right to go through the other doorframe and into the next room. Had Barner moved straight back, she would have been standing against the front wall with the officers practically on top of her. Moreover, when the officers entered, Barner only took three or four small steps backward and stood directly in the gap between the couch and the front wall, thus blocking the left-diagonal path into the room. If anything, her movement and positioning could reasonably be interpreted as signifying her desire to limit the officers' entry into the home. Even if the front wall were not there, the Court is skeptical that turning slightly could reasonably be read as consent, although the circumstances of each case vary. It would be unjust to require that a person seeking to protect their home from a warrantless search must move with robotic precision to prevent even the smallest inference of consent.

On the other hand, the Court notes that Barner later commented, "I let you come inside my house to look at stuff and now you tell me I can't move around my house." (Exhibit E at 22:50:47). That comment implies, perhaps, that Barner herself believed she consented to the officers' initial entry into her house. It could also imply, however, that Barner felt she merely failed to stop the entry. Given the ambiguity of this statement, the Court attributes little meaning to it.

On balance, the Court agrees with Judge Roberts that Barner's mere failure to explicitly object and acquiescence to the officers' entry does not constitute consent. Even in the absence of implicit coercion, "the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry." *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990). Indeed, the burden is on the government to show "unequivocal and specific" consent, not on a defendant to show an unequivocal and specific objection. *Id.* This failure to object, even in conjunction with Barner's slight turn and adjustment of her glasses, could not reasonably be understood as consent.

Of the factors considered in the Eighth Circuit, the two most applicable here are Barner's silence and the intimidating presence of the officers. *See Johnson*, 619 F.3d at 918. Barner's silence is more akin to *Serabia-Ferrel*; she merely backed up and said nothing. *See* 2011 WL 3625140, at *1. Her silence was unaccompanied by some action implying consent like in *Rodriguez* where the defendant turned around, opened the door, walked inside the house, and held the screen door in response to the officers' requests to enter. *See* 834 F.3d at 939-40. The show of authority by the officers here is somewhere in-between; far less threatening than the raid-ready squad in *Serabia-Ferrel* but more imposing than the plain-clothed officers in *Rodriguez*. On balance, the facts here show that Barner was prevented from objecting to the entry in part by the intimidating circumstances. Barner opened her door to two uniformed officers with holstered weapons and flashing squad car lights. She immediately expressed confusion. Just over a minute after opening the door and answering a few basic questions, the officers advanced into the home without giving Barner any information about the situation. Under that stupefaction, a reasonable officer would have interpreted Barner's silence as a mere acquiescence to police authority rather than consent.

Moreover, Barner's subsequent consent to search the bedroom did not show that she consented to the officers' presence in the home. When the officers initially asked to search the bedroom, she said no. (Ex. E at 7:09). Once Barner was informed of the possible presence of a firearm, which she said would not be allowed in her house, she remained skeptical. She asked whether the officers intended to search the whole house and, after the officers said that might be a possibility later, she stated "Are you kidding me right now?" (*Id.*, at 7:50). She then asked the officers specifically what they needed to look for. The officers told her they only needed to search the area near her bedroom door "really quick." Barner then walked the officers up to the bedroom door and then, after the brief search of the bedroom, walked them back down to the entryway. (*Id.*, at 8:20–9:07). She later repeatedly denied requests to search the home and her vehicle. At every turn, Barner declined to give consent and offered only a limited, supervised search of the bedroom after the officers had already entered the home without her consent. On these facts, no reasonable officer would infer the search of the bedroom as indicating her consent or subsequently approving their entry.

Even if the Court found that the officer's initial entry into the home was consensual, the officers did not discovery the firearm at that time. Rather, officers found the firearm only later when conducting a further search of the residence for other people. Because the Court finds that later protective sweep unjustified by exigent circumstances, the Court would find evidence of the firearm was properly suppressed regardless of the legality of the initial entry.

Thus, the Court **overrules** the government's objections (Doc. 34, at 1-2) and **adopts** Judge Roberts' R&R without modification on this issue.

### B.    *Exigency as Justification to Enter the Home*

The R&R held that the officers' entry into defendant's home was not supported by exigent circumstances. (Doc. 33, at 17-28). First, the R&R found that the officers did

not have probable cause to believe that someone in the residence was in danger because the circumstances gave rise to only a possibility that there was some third-party hiding in the house. Second, the R&R found that a reasonable officer would not have believed that the destruction of evidence was imminent. Thus, because there was no exigency, the officers' warrantless entry into the home was improper.

The government objects, arguing that the officers had probable cause to believe that some third-party was present in the car with defendant, may still be present in the house, and may pose a threat to the officers' or occupants' safety. The government also asserts that the officers reasonably believed that this third-party could destroy potential evidence. (Doc. 34, at 2-3).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted)). Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at (1980) (quoting *United States v. U.S. Dist. Ct. of Mich., S.D.*, 407 U.S. 297, 313 (1972) (internal quotation marks omitted)). When a warrantless entry and search is conducted in a home, the government bears the burden of proving that an exception to the warrant requirement applies. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980).

Exigency is a recognized exception to the warrant requirement. *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003). "The exigent circumstances exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) (alteration omitted)). "The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could

reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). Courts consider "the circumstances that confronted police at the time of entry" to determine whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005).

Both safety and preservation of evidence may present exigency. To determine whether the safety of officers or others justifies a warrantless entry, courts must focus objectively "on what a reasonable, experienced police officer would believe." *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (quotation omitted). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence . . . will immediately destroy evidence." *Ramirez*, 676 F.3d at 760 (citing *United States v. Clement*, 854 F.2d 1116, 1119 (8th Cir. 1988)). Exigency does not inherently exist, however, merely because there is probable cause to believe that a serious crime has been committed. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *United States v. Neadeau*, No. 17-CR-173 (SRN/LIB), 2018 WL 301192, at *9 (D. Minn. Jan. 5, 2018).

The Court recognizes that the officers likely had probable cause to believe defendant was involved in a shooting. Defendant fled at a high rate of speed from the shooting, briefly ran inside his residence, ran back out to talk to officers, was sweating and nervous, and lied to officers about who was driving the vehicle. Many of these facts can, however, be innocently explained. Most people would flee the scene of a shooting. It is not unusual to be sweaty in the middle of June. Given that defendant had just fled a shooting and was now being confronted by officers, his nervousness is somewhat expected. This analysis though is ultimately beside the point. Exigency to search the home was not present even if officers reasonably interpreted these facts as establishing probable cause that defendant was involved in a shooting. *See Welsh*, 466 U.S. at 753.

The Court must examine what exigency was present beyond the fundamental seriousness of the investigation at issue.

Because defendant was present on the front lawn with officers, exigency could only have been present if the officers could have reasonably believed that some third-party was also involved and presented a threat either to safety or the integrity of evidence. The only fact that suggests the presence of a third-party is defendant's initial lie that Barner was driving the vehicle. Barner quickly denied driving the vehicle or being out of the house at all, prompting defendant to admit that he was driving without a valid license. Barner expressed total confusion about what was going on and had little, if any, opportunity to formulate a narrative with defendant. Barner repeatedly stated that the only persons in the home were her, her son who was playing a video game, and her uncle who was sleeping. There were no signs of a domestic disturbance, not even a bark from the dog upstairs. Barner also stated that, to her knowledge, defendant was alone when he entered the house and that he was the one driving the car. (Ex. E at 5:05). She also appears to suggest that defendant gave her back her car keys before exiting the house, which is consistent with defendant driving the car and attempting to make it seem as if Barner was driving. No witness claimed to see anyone else in the car with defendant, or exit the car and go into the house with defendant.

The Court finds that a reasonable officer would not believe that a third-party connected to the shooting was present in the home. The officers would have to believe that a third-party was involved in the shooting, fled into the home, and hid all without disturbing any of the home's occupants or furnishings. Although possible, the likelihood of this is substantially lessened by defendant's quick recanting of his lie and explanation that he did not have a valid license. Outside of that quickly abandoned falsehood, nothing suggests that a third-party was involved at all, much less still present in the home.

On these facts, the officers' belief that some other, unidentified person presented some form of exigency was not reasonable.

Thus, the Court **overrules** the government's objections (Doc. 34, at 2-3) and **adopts** Judge Roberts' R&R without modification on this issue.

### C.    *Propriety of the Protective Sweep*

The R&R held that the officers' protective sweep of the home was improper. (Doc. 33, at 29-32).   Specifically, the R&R found that the officers were not lawfully present in defendant's home and, in the alternative, that the officers' suspicion that a third-party may be present in the home with access to a firearm "never [rose] above a mere suspicion." (*Id.*).   The government objects, asserting that the officers were lawfully present in the home and that the sweep was justified because there was a "possibility" that a dangerous third-party was present in the home.   (Doc. 34, at 3).

"Upon legally entering a residence, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990)).   "A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger." *Id.*   A protective sweep is proper even if the potential individual being searched for is unidentified. *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005).

As held above, the Court finds that the officers did not lawfully enter the residence. They did not have a warrant authorizing their entry and neither the consent nor exigency exceptions apply here.   Even if the officers were lawfully present in the home, the Court finds, as above, that a reasonable officer would not have believed that a dangerous third-party was hidden somewhere inside.   The officers were unable to articulate any specific

facts showing a reasonable belief the home was harboring an individual who could be dangerous. Officers had no evidence anyone else accompanied defendant from the scene of the shooting or was with defendant in the car. Barner told the officers repeatedly that only her son and uncle were present and had, with her, been there all day. Indeed, Barner even allowed the officers to follow her upstairs to search the one room she said defendant entered when he came into the home alone. Officers searched that room for another person and found none but Barner's child and a dog. This limited search should have dissipated, at least to some degree, any reasonable suspicion to believe that another person connected to the shooting was hiding in the home. It certainly could not have enhanced the officers' belief the home harbored another person who posed a danger to them. No other facts arose while the officers were in the home prior to the protective sweep to give them any additional reason to believe a suspect was hiding inside. The mere possibility that a third-party could be present and could launch an attack falls short of the reasonable suspicion required.

The Court also notes that approximately 36 minutes elapsed between the time the officers entered the home and the time the protective sweep began. There is scant authority on whether a time gap between a warrantless entry and a protective sweep has any bearing on the propriety of a sweep. In *United States v. Dabrezil*, both the district court and Eleventh Circuit Court of Appeals, applying a different standard for protective sweeps that does not require any suspicion,[7] found that a seven to 25-minute delay was immaterial. No. 13-20765-CR-GRAHAM/GOODMAN, 2013 WL 11327706, at *14

---

[7] A protective sweep incident to an arrest may be conducted in a limited area without reasonable suspicion or probable cause. *Waldner*, 425 F.3d at 517 (quoting *Buie*, 494 U.S. at 334). A broader sweep incident to an arrest requires "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* (quoting *Buie*, 494 U.S. at 337). In a non-arrest situation, as here, the second prong alone applies, and reasonable suspicion is required to conduct a protective sweep. *Id.*

(S.D. Fla. Nov. 27, 2013) (noting that although the sweep was not immediate, any delay could be considered minimal), *adopted by* 2013 WL 11328381, at *1 (Dec. 13, 2013), *aff'd*, 603 Fed. App'x 756, 759-60 (11th Cir. 2015) (holding that the officer's delayed sweep was proper because exigency was not required and the officer arrived later than the other officers, who had not yet swept the apartment). Given that the delay here was longer and under different circumstances, *Dabrezil* offers little guidance.

The only relevance the delay could have here is whether a reasonable officer would believe that a threat was still present despite the officers being in the house for more than half an hour. As discussed, the Court has already found that a reasonable officer would not have believed a threat existed at the outset. On one hand, the significant delay here could further lessen the reasonableness of a belief that a threat existed. The officers here stood in the living room, walked up and down the stairs, checked nearby rooms, talked to the occupants, and spoke about their search at a volume likely audible throughout the small house. During that time, nothing occurred to suggest a danger was present. To analogize, perhaps the longer a person stands in a swamp without being bitten by an alligator makes that person's belief that the swamp is dangerous less and less reasonable. On the other hand, an alligator could still emerge. Some threat lying in wait in the house could have remained hidden until an opportune moment. Indeed, just because a threat does not immediately present itself at or near the time of entry does not necessarily mean or make less likely that a more calculated threat is not present.

On balance, the Court finds the delay here somewhat lessened the reasonableness of the officers' belief that some threat existed, particularly in light of the officers' opportunities to briefly enter other rooms in the small house. The continuing possibility of a threat after the shooting, however, leads the Court to give the delay little significance overall in its analysis. Even if the mere possibility of a threat was insufficient to support

a reasonable belief here, it is understandable that the officers remained on alert under these circumstances even after a significant delay.

Thus, the Court **overrules** the government's objections (Doc. 34, at 3) and **adopts** Judge Roberts' R&R without modification on this issue.

### D.     Consent to Seizure of the Firearm as Purging Unconstitutional Conduct

The R&R held that Barner's consent to the officers' seizure of the firearm did not purge the taint of any prior unconstitutional conduct. (Doc. 33, at 32-38). The R&R noted that the government cited no authority for the proposition that consent to seize an item found during an illegal search could purge the search's illegality. (*Id.*, at 32-33). The R&R held that Barner's consent to seize the firearm showed just that, her consent to remove the firearm from her home; it did not show her approval of the search leading up to the firearm, which she explicitly objected to. The government objects "[f]or the reasons stated in [its] suppression resistance[.]" (Doc. 34, at 3). The government reasserts that Barner's consent to seize the firearm purged any prior unconstitutional conduct because it was an act of free will under the circumstances.

"To vitiate the unlawfulness of an entry, consent to a search must be both voluntary and an intervening independent act of free will sufficient to purge the primary taint of the unlawful invasion." *United States v. Brandwein*, 796 F.3d 980, 985 (8th Cir. 2015) (quoting *Brown v. Illinois*, 422 U.S. 590, 598 (1975) (internal quotation marks omitted)). "Whether consent sufficiently disperse the taint of an unlawful entry is determined by reference to temporal proximity between the entry and the consent, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." *Id.* (quoting *Brown*, 422 U.S. at 603-04) (internal quotation marks omitted).

The Court finds that Barner's subsequent consent to the seizure of the firearm was far from a "voluntary and an intervening independent act of free will." *See Brandwein*,

796 F.3d at 985. Upon being told that the officers were going to search her home prior to deciding whether to obtain a warrant, Barner was nothing short of unequivocal that she did not consent. (Ex. F at 0:30). She insisted that the officers obtain a warrant. (*Id.*, at 1:15). They declined. Barner asked "So you're telling me you can be in my house without a warrant and I have no say?" The officer responded "Yes" and asserted they were in fact applying for a search warrant and that they were not required to wait outside. Barner reiterated "You're not doing this with my kid here, dude. It's not happening. . .. No it's not. . .. No it isn't." (*Id.*, at 1:35). Barner was ultimately forced to retrieve her son and uncle and sit on the couch while the officers searched her home. The fact that she tersely approved of the seizure of the firearm later does little to mitigate her clear and unwavering resistance to the sweep. (Ex. F-2 at 23:45).

Although the officers were polite and acted with a rightful purpose, official misconduct occurred here. The officers were, without a doubt, justified in acting with haste in the wake of a nearby shooting. That justification, however, did not make their entry or sweep of the home proper. Their desire to act quickly to protect the community, although commendable, should not have overridden Barner's objections under these circumstances. Because a reasonable officer would not have believed that Barner consented or that exigency existed, Barner's protests should have been honored and officers should not have conducted the sweep. Moreover, despite the time gap from the entry to the search, there were no intervening events which lessened the entry's unlawfulness. Again, the fact that Barner did not want firearms in her home and agreed to the firearm's seizure does not erase the wrongful rejection of her asserted right to be free from an unreasonable search.

Thus, the Court **overrules** the government's objections (Doc. 34, at 3) and **adopts** Judge Roberts' R&R without modification on this issue.

### E. Good Faith

The R&R held that the *Leon* good faith exception does not apply here. (Doc. 33, at 38-41). Specifically, the R&R found that a reasonable officer would not have believed they were lawfully present in the home or that a protective sweep was proper under the circumstances. The government objects, noting that the officers did ultimately obtain a warrant and relied in good faith on that warrant. (Doc. 34, at 3-4).

In *Leon*, the Supreme Court "created the good-faith exception to the exclusionary rule." *United States v. Johnson*, 78 F.3d 1258, 1261 (8th Cir. 1996) (citing *Leon*, 468 U.S. at 922). In explaining the need to create a good faith exception to the exclusionary rule, the Supreme Court reasoned that:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon*, 468 U.S. at 921 (alteration, citation, and internal quotation marks omitted). Under *Leon*'s good-faith exception, the Fourth Amendment exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." *United States v. Taylor*, 119 F.3d 625, 629 (8th Cir. 1997) (citing *Leon*, 468 U.S. at 905, 922-23). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916.

For the good faith exception to apply when the warrant is based on evidence obtained in violation of the Fourth Amendment, "the [officers'] prewarrant conduct must have been close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable. If the officers' prewarrant conduct is clearly illegal, the good faith exception does not apply." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (internal quotation marks and citations omitted)).

The Court has already determined that the officers' prewarrant conduct violated the Fourth Amendment. The Court now also finds that the conduct was not "close enough to the line of validity" to make the officers' subsequent belief in the validity of the warrant reasonable. *See Cannon*, 703 F.3d at 413. As discussed, nothing about Barner's response to the officers' entry indicates anything more than acquiescence. *See Rodriguez*, 834 F.3d at 941 (noting that the defendant opened the door wider and walked into his residence in response to the officers' request to enter); *United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010) (stating that the defendant held the door and invited officers to enter); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) (noting that the defendant opened the door further and stepped backward in response to the officers' request to enter). She merely backed up and adjusted her glasses as the officers moved forward, without turning around, opening the door further, responding affirmatively, waiving them inside, or anything else that might indicate consent. Moreover, although officers had a vague suspicion that a third-party may have been involved, it was not sufficiently close to the line of exigency such that their entry was proper.

Because the officers' prewarrant conduct of entering the home without a warrant or a sufficient exception, and conducting a protective sweep of the home without an articulable factual basis to believe it harbored a dangerous person, was clearly illegal, it cannot support their later reliance on the warrant. Thus, the good faith exception does

not apply here. The goal of deterring police misconduct, i.e. executing a warrantless entry on a home without an exception, would be furthered by suppression here. *See Leon*, 468 U.S. at 916.

Thus, the Court **overrules** the government's objections (Doc. 34, at 3-4) and **adopts** Judge Roberts' R&R without modification on this issue.

## V.  CONCLUSION

For these reasons, the Court **overrules** the government's objections (Doc. 34), **adopts** Judge Roberts' R&R without modification (Doc. 33), **grants** defendant's motion to suppress, and **denies** defendant's request for a *Franks* hearing (Doc. 19).

**IT IS SO ORDERED** this 26th day of February, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa